50 S.W.3d 210 (2001)
Ruth SAKLER and Allen M. Sakler, Appellants,
v.
ANESTHESIOLOGY ASSOCIATES, P.S.C.; Kenneth Richter, M.D.; and Christine Bohn, Appellees.
No. 1999-CA-001112-MR.
Court of Appeals of Kentucky.
January 12, 2001.
Discretionary Review Denied by Supreme Court August 15, 2001.
*211 Gary R. Hillerich, Louisville, KY, Irwin M. Ellerin, Atlanta, GA, for Appellants.
W. Gregory King, Stephen C. Hall, Louisville, KY, for Appellees.
Before BUCKINGHAM, McANULTY, and SCHRODER, Judges.

OPINION
BUCKINGHAM, Judge.
Ruth and Allen Sakler appeal from a judgment of the Jefferson Circuit Court resulting from a jury verdict adverse to them on their claims of medical negligence against Anesthesiology Associates, P.S.C., Dr. Kenneth Richter, and Christine Bohn. We have reviewed the record, the oral and written arguments of counsel, and the applicable law. Being sufficiently advised, we affirm.
In January 1996, Ruth Sakler, then 83 years old, fell and fractured her left hip. She underwent surgery and was eventually discharged home. Because her fracture had not healed properly, she underwent additional hip revision surgery on April 2, 1996.
Anesthesiology Associates, P.S.C., was in charge of anesthesia for that surgery, and the anesthesia was administered by certified registered nurse anesthetist Christine Bohn under the supervision of Dr. Kenneth Richter, an anesthesiologist. The anesthetic care included general anesthesia and endotracheal intubation.[1] Intubation was administered by Nurse Bohn under the supervision of Dr. Richter, who was physically present at Mrs. Sakler's bedside at that time.
Following the surgery, Mrs. Sakler developed a degree of bilateral vocal cord paralysis, which was exhibited by stridor (a labored breathing which can be caused *212 by vocal cord paralysis) and by dysphagia (difficulty swallowing). A food tube was inserted in her abdomen so she could receive adequate nutrition, and a tracheotomy was performed to help her breathe. Mrs. Sakler was eventually released from the hospital to a retirement community due to her general health and physical condition.
Because of her vocal cord paralysis, Mrs. Sakler brought a medical malpractice action against Nurse Bohn, Dr. Richter, and Anesthesiology Associates, claiming her condition was caused by the negligence of Nurse Bohn and Dr. Richter during surgery. The gist of her claim involved the alleged negligent use of the intubation tube. Dr. Allen Sakler, her husband, brought a loss of consortium claim against the same defendants.
At the conclusion of the jury trial, the jury returned a verdict in favor of Nurse Bohn, Dr. Richter, and Anesthesiology Associates. The trial court subsequently entered a judgment dismissing the Saklers' claims. When the Saklers' motion for a new trial and/or a judgment notwithstanding the verdict was denied by the trial court, this appeal followed.
The Saklers' first argument is that the trial court committed reversible error by permitting a defense expert witness to render an expert medical opinion based on "speculation" and "possibility" rather than reasonable medical probability. The appellees admit that one of their expert witnesses, Dr. Jeffery Bumpous, an otolaryngologist, testified as to causation of Mrs. Sakler's condition in terms of possibilities rather than reasonable medical probability. When asked about the cause of Mrs. Sakler's bilateral vocal cord paralysis, Dr. Bumpous's answers included the following:
It's difficult to determine what caused the bilateral vocal cord paralysis in Mrs. Sakler. One can only speculate on some probabilities. I think there are some real confounding factors in this case, particularly that Mrs. Sakler had a history of total thyroidectomy or thyroid surgery in the past that make it a very confounding situation in terms of telling what causes vocal cord paralysis. Also, there are multiple conditions that can cause vocal cord paralysis. And I think that it is presumptuous to assume that it was endotracheal intubation that resulted in her vocal cord paralysis.
. . . .
From a review of the records, you cannot give a definite cause of Mrs. Sakler's vocal cord paralysis. There are some possibilities that occur in there. It's very presumptuous to assume in somebody who has had prior thyroid surgery, even forty years earlier, that the vocal cord paralysis came fromor the fixation of the vocal cordsit may not even be paralysisthe fixation of the vocal cords came from endotracheal intubation. There are multiple causes that canthat we have listed a few of them previously but certainly thyroid surgery is a much more frequent cause of bilateral vocal cord paralysis than endotracheal intubation.
. . . .
. . . [i]f you review her records, there's mention of a discoordinate swallow and there's mention of multi-infarcted situation or a possibility of multiple strokes.
. . . .
It's possible that prior surgery in the region of the recurrent nervesthyroidectomymight increase susceptibility to subsequent injuries of the nerve or problems with the nerve.
. . . .
. . . I'm not trying to be particular on this, but in terms of reasonable probability, *213 I think I can describe some possibilities but not aI don't think you can decide a probableprobability. . . .
. . . .
. . . I think that anybody who looks at Mrs. Sakler in this case can only talk about possibilities. If we're talking about possibilities, they can only talk about the possibility of the endotracheal tube problem, the possibility of thyroid surgery, the possibility of neurological deficits, the possibility of an idiopathy thing.
The Saklers cite numerous cases for the proposition that the opinion of a medical expert must be based on reasonable medical probability and not speculation or possibility. For example, see Baylis v. Lourdes Hospital, Inc., Ky., 805 S.W.2d 122, 124 (1991), and Morris v. Hoffman, Ky.App., 551 S.W.2d 8, 9 (1977). On the other hand, the appellees argue that the Saklers had the burden of proof[2] and that they (appellees) had a right to impeach the testimony of the Saklers' expert witnesses without being required to prove alternate causation theories with reasonable medical probability. Further, they contend that the cases cited by the Saklers are distinguishable because they relate only to expert witnesses offered by the party with the burden of proof. The appellees also argue that, even if they had the burden to prove an alternative cause by reasonable medical probability, then Dr. Bumpous's testimony in that regard was sufficient even though he only used the term "a likely possibility."[3] Neither party has cited any Kentucky case directly on point nor are we aware of any such case.
KRE[4] 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Further, the testimony of every witness, including expert witnesses, is subject to attack by impeachment from the testimony of other witnesses. See Brown v. Commonwealth, Ky., 934 S.W.2d 242, 247 (1996). We conclude that defendants in medical malpractice actions may introduce expert witness testimony to rebut a plaintiff's expert witness testimony couched in terms of "reasonable medical probability," even though the defendant's expert witness's testimony is couched only in terms of "possibility." In so deciding, we are persuaded by the reasoning of the United States Court of Appeals for the First Circuit in the case of Wilder v. Eberhart, 977 F.2d 673 (1st Cir. 1992), cert. denied 508 U.S. 930, 113 S.Ct. 2396, 124 L.Ed.2d 297 (1993).
In Wilder, a plaintiff patient filed suit against her defendant doctor and clinic for medical malpractice, alleging the doctor's surgical procedure caused her to suffer an esophageal injury. At trial, the plaintiff's expert witness testified that her injury was caused by the defendants' medical negligence. Expert medical testimony on behalf of the defendants, however, was ruled inadmissible by the trial court because it could not be expressed in terms of "probability" as distinguished from "medical possibility." *214 In holding the trial court erred in excluding this testimony, the First Circuit reasoned as follows:
[P]roximate causation between negligence and the injury complained of in a medical malpractice case must be established by expert testimony. (Citation omitted.) On the other hand, the defendant need not disprove causation. Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence. (Citation omitted.) As the New Hampshire Supreme Court recently stated in Tzimas [v. Coiffures By Michael, 135 N.H. 498, 606 A.2d 1082, 1084 (1992) ], the plaintiff in a negligence action bears the burden of producing evidence "to prove that it is more likely than not that [plaintiff's] injury was" caused by the defendant's negligence. (Citation omitted.) Defendant need not prove another cause, he only has to convince the trier of fact that the alleged negligence was not the legal cause of the injury. (Citation omitted.) In proving such a case, a defendant may produce other "possible" causes of the plaintiff's injury. These other possible causes need not be proved with certainty or more probably than not. To fashion such a rule would unduly tie a defendant's hands in rebutting a plaintiff's case, where as here, plaintiff's expert testifies that no other cause could have caused plaintiff's injury. The burden would then shift and defendant would then bear the burden of positively proving that another specific cause, not the negligence established by plaintiff's expert, caused the injury. Certainly, this is much more than what should be required of a defendant in rebutting a plaintiff's evidence.
Were we to accept plaintiff's argument that once a plaintiff puts on a prima facie case, a defendant cannot rebut it without proving another cause, the resulting inequities would abound. For example if ninety-nine out of one hundred medical experts agreed that there were four equally possible causes of a certain injury, A, B, C and D, and plaintiff produces the one expert who conclusively states that A was the certain cause of his injury, defendant would be precluded from presenting the testimony of any of the other ninety-nine experts, unless they would testify conclusively that B, C, or D was the cause of injury. Even if all of defendant's experts were prepared to testify that any of the possible causes A, B, C or D, could have equally caused plaintiff's injury, so long as none would be prepared to state that one particular cause, other than that professed by plaintiff more probably than not caused plaintiff's injury, then defendant's experts would not be able to testify at all as to causation.
Wilder, 977 F.2d at 676-77.[5] We agree with the First Circuit that expert testimony of this nature is admissible on behalf of defendants in medical malpractice cases in order to rebut the testimony of plaintiffs upon whom the burden of proof rests. Therefore, we affirm the ruling of the trial court in this regard.
The Saklers' second argument is that the trial court committed reversible error in failing to sustain their directed verdict motion since deviations from the standard of care were established as a *215 matter of law. They contend the trial court should have held as a matter of law that the appellees deviated from the standard of care by failing to obtain an informed consent for Nurse Bohn to administer the anesthesia, by Anesthesiology Associates' failure to conduct regular educational meetings with its physicians and nurses, and by the negligent use of an endotracheal tube that was too large.
When the trial court denied the Saklers' motion for a new trial and/or a judgment notwithstanding the verdict, it held that the directed verdict motions had been properly denied at trial because there was insufficient evidence of causation even if the appellees had deviated from the standard of care. In ruling on the trial court's denial of the Saklers' directed verdict motions, we are guided by Everley v. Wright, Ky.App., 872 S.W.2d 95 (1993), wherein it was held:
In ruling on a motion for a directed verdict, the trial court is to consider the evidence in the strongest possible light in favor of the party opposing the motion. A directed verdict must not be entered unless there is "a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ."
Id. at 96, quoting Taylor v. Kennedy, Ky.App., 700 S.W.2d 415, 416 (1985).
Concerning the informed consent issue, the Saklers assert that the appellees failed to obtain an informed consent for Nurse Bohn to administer the anesthesia and that Mrs. Sakler would not have consented to the surgery had she known the anesthesia was to be administered by a nurse. She testified in this regard that she does not remember being informed regarding the use of a certified registered nurse anesthetist and that the consent form expressly provided that the anesthesia care was to be administered by a physician. On the other hand, Nurse Bohn testified she always introduces herself to patients and informs them of her role in the surgery, and defense expert witness Dr. Frederick Chaney, an anesthesiologist and Chairman of the Department of Anesthesia at the University of Washington School of Medicine, testified that the use of a nurse anesthetist for intubation purposes under the direction of the physician met the standard of care. We believe the testimony was sufficient to create an issue of fact for the jury, and a directed verdict would have been improper. Taylor, 700 S.W.2d at 416.
Regarding the Saklers' argument that they were entitled to a directed verdict on the standard of care issue since Anesthesiology Associates failed to conduct regular educational meetings, Dr. Chaney, one of the appellees' expert witnesses, testified that the failure to conduct such educational meetings or to employ some other method of informing nurse anesthetists would be a breach of the standard of care. However, Dr. Chaney also testified that Anesthesiology Associates used two physician liaisons to communicate with the nurse anesthetists and that such procedure was an adequate and reasonable method of conforming with such standard. Thus, we conclude there was a fact issue in this regard and that the denial of a directed verdict was proper. Further, there is no evidence that the failure to have educational meetings was, in any way, the proximate cause of Mrs. Sakler's condition.
The Saklers further contend they were entitled to a directed verdict on the issue of whether the appellees were negligent in using the wrong size tube in the endotracheal intubation. They base this argument on the fact that Mrs. Sakler's hospital record indicates a size 7.5 was used, but the hospital bill indicates a size 8 *216 was used. The fact that the record indicates a different size tube from that actually used does not prove the use of the wrong size tube. Thus, the trial court properly denied the Saklers a directed verdict in this regard.
Finally, the Saklers contend the trial court committed reversible error in excluding, as well as in the manner of excluding, a juror during the trial. During the course of the trial, one of the jurors made the court aware that a certain juror was sleeping. The court then asked two other jurors, outside the presence of the jury, if they had knowledge of whether the juror was sleeping. The two jurors each indicated that such was their belief.
The court then indicated to trial counsel that the alleged sleeping juror would be one of the alternate jurors to be excluded at the end of the case. The juror was never questioned concerning the allegations made by the other jurors. Immediately prior to the closing arguments of the attorneys, the court asked for further input from counsel, to which the Saklers' attorney responded he had not researched any law on the issue. The court then determined there was sufficient evidence to believe the juror had been sleeping during the trial and excused the juror as one of the two alternate jurors to be excused.
On the day following the conclusion of the trial, the juror in question called the Saklers' attorney asking for representation in an unrelated post-divorce matter. In response to the question concerning whether he was sleeping during the trial, the juror adamantly denied it. He stated he had undergone two previous sinus surgeries, which caused his normal breathing to sound like snoring even though he was wide awake. The Saklers' attorney procured an affidavit from the juror in which the juror stated he did not sleep during the trial. Based upon the affidavit, the Saklers made a motion for a new trial and/or a judgment notwithstanding the verdict.
The trial court denied the motion on the ground that the juror had been excused with the mutual agreement of the parties and that any potential for error had been waived. Because the Saklers' attorney voiced no objection when the juror was excused, we agree.
For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.
ALL CONCUR.
NOTES
[1] Endotracheal intubation involves the insertion of a tube into the trachea of a patient for maintenance of the airway during anesthesia. Stedman's Medical Dictionary 797 (25th ed.1990).
[2] "The burden of proof in a malpractice case is, of course, on the party charging negligence or wrong." Johnson v. Vaughn, Ky., 370 S.W.2d 591, 596 (1963).
[3] An expert medical witness is not required to use the magic words "reasonable probability." See Turner v. Commonwealth, Ky., 5 S.W.3d 119, 122 (1999).
[4] Kentucky Rules of Evidence.
[5] See also Haas v. Zaccaria, 659 So.2d 1130 (Fla.App.1995), wherein the court held that "even assuming that `reasonable medical probability' is part of a claimant's burden of proving a claim of medical negligence, we do not agree that such a burden logically compels the conclusion that the defendant doctor is precluded from offering evidence of possible explanations other than his own individual or joint negligence." Id. at 1133.