IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 17, 2002 Session

## PATSY MITCHELL, ET UX. v. DR. JAMES ENSOR, M.D., ET AL.

**A Direct Appeal from the Circuit Court for Shelby County**
**No. 98798 T.D.     The Honorable D'Army Bailey, Judge**

---

**No. W2001-01683-COA-R3-CV - Filed November 18, 2002**

---

Patient brought medical malpractice action against physician and medical group, including allegations that physician failed to obtain the informed consent of female patient prior to administration of a testosterone injection. The circuit court entered judgment on a jury verdict in favor of physician and medical group. Patient appealed. We affirm and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Robert A. McLean, Memphis, For Appellants, Patsy and Steve Mitchell

Albert C. Harvey, Elizabeth T. Collins, Memphis, For Appellees, Dr. James Ensor, M.D. and Memphis Internal Medicine, P.L.L.C.

### OPINION

Plaintiffs' complaint alleges that Dr. James Ensor, M.D., and his employer, Memphis Internal Medicine, committed medical malpractice when Dr. Ensor negligently presented and administered a 2cc injection of Depo-Testosterone for the treatment of plaintiff's diminished libido and failed to obtain informed consent prior to administering the injection. Depo-Testosterone is a male hormone traditionally "indicated for replacement therapy in the male in conditions associated with symptoms of deficiency or absence of endogenous testosterone." Quoting from the complaint, plaintiff specifically averred the following:

> 13. The Defendant James K. Ensor, M.D., engaged in a
> course of conduct that was inconsistent with and deviated from that
> degree of care and skill, and to failed [sic] possess that degree of
> knowledge, as ordinarily exercised and possessed by physicians

engaged in the practice of internal medicine in Memphis, Shelby County, Tennessee and similar communities engaged in the administration of hormone replacement therapy by failing to follow appropriate and accepted procedure for post-menopausal hormone replacement therapy in the following respects:

(a) by undertaking to administer post-menopausal hormone therapy when he was not qualified to do so and by failing to refer the Plaintiff Patsy Mitchell to a physician who was so qualified;

(b) by not requesting or performing any diagnostic tests or screenings prior to the administration of testosterone therapy, including but not limited to a blood test to determine the Plaintiff Patsy Mitchell's serum androgen level;

(c) by engaging in course of treatment which he knew or should have known would be harmful to the Plaintiff Patsy Mitchell;

(d) by ordering an excessive dosage of Depo-Testosterone under the circumstances;

(e) by failing to adhere to the manufacturer's guidelines in administering Depo-Testosterone to the Plaintiff Patsy Mitchell;

(f) by administering Depo-Testosterone to the Plaintiff Patsy Mitchell when the use of Depo-Testosterone has not been approved by the United States Food and Drug Administration under such circumstances;

(g) by failing to counsel the Plaintiff Patsy Mitchell on the risks and benefits of, and alternatives to hormone replacement therapy.

*          *          *

The Defendant James K. Ensor, M.D., failed to exercise that degree of care and skill, and to possess that degree of knowledge, as ordinarily exercised and possessed by physicians engaged in the practice of internal medicine in Memphis, Shelby County, Tennessee and similar communities by failing to reasonably inform the Plaintiff Patsy Mitchell of the serious nature of hormone replacement therapy and of the risks of virility, including hirsutism and clitoromegaly, that could result from the administration of male sex hormones such as Depo-Testosterone to a female patient.

       *       *       *

> As a direct and proximate result of the Defendants' negligence and/or recklessness in administering Depo-Testosterone to the Plaintiff Patsy Mitchell, the Plaintiff Patsy Mitchell has suffered and will in the future continue to suffer signs of virility, including but not limited to permanent disfigurement, hirsutism, clitoromegaly, and painful intercourse, and psychological injuries, which would not have otherwise have occurred in the absence of Defendants' negligence.

In their answer to this complaint, Dr. Ensor and Memphis Internal Medical admitted treating Mrs. Mitchell's developing asexual disposition with a 2cc intramuscular injection of Depo-Testosterone. Defendants denied any negligent act or omission in the care of Mrs. Mitchell, instead asserting that "they acted according to their best medical judgment and in conformity with the applicable standard of care." Defendants admitted a discussion with Mrs. Mitchell regarding her diminished libido, and maintained that Dr. Ensor "discussed the use of Depo-Testosterone" with Mrs. Mitchell prior to ordering administration of the injection.

Plaintiff Patsy Mitchell is a middle-aged woman of limited education with a storied history of medical and physical ailments. The following facts are uncontroverted. Mrs. Mitchell first sought treatment from Dr. Ensor in 1995.[1] Over the course of roughly four years, Dr. Ensor acted as Mrs. Mitchell's primary caregiver, treating her for numerous medical complaints, including gout, osteoarthritis, chronic bronchitis, hypertension, chronic sinus, high cholesterol, and irritable bowel syndrome. Mrs. Mitchell's medical records indicate that Dr. Ensor, and several treating physicians prior to him, administered hormone therapy to Mrs. Mitchell for complications potentially related to patient's menopausal condition. These records also reveal that Mrs. Mitchell suffered adverse reactions to several of the hormone treatments.

On January 5, 1998, Mrs. Mitchell visited Dr. Ensor for treatment of a bloated abdomen.[2] At the time of the visit, Dr. Ensor was practicing with Memphis Internal Medicine. Mrs. Mitchell was accompanied by her husband, plaintiff Steve Mitchell. During the visit, Dr. Ensor examined Mrs. Mitchell's stomach for the purpose of evaluating the patient's complaints of stomach bloating. From his examination, Dr. Ensor determined that further tests were necessary and thereby scheduled Mrs. Mitchell for a barium enema and colon study.

The parties fiercely dispute the nature of the events or conversations immediately preceding the injection. According to Mr. Mitchell's testimony, after the examination, he approached Dr. Ensor with a written list of Mrs. Mitchell's health complaints. Mr. Mitchell's involvement in

---

[1] At the time of Mrs. Mitchell's initial 1995 visit, Dr. Ensor was employed as an internal medicine physician with Peabody Health Care.

[2] Plaintiff Patsy Mitchell testified on direct examination that she also sought treatment for chest pains from Dr. Ensor on her January 5 visit. However, plaintiffs' complaint does not identify chest pains as a reason for this visit.

keeping a current list of Mrs. Mitchell's medical complaints was a common practice of the plaintiff couple. At the bottom of the list, Mr. Mitchell had scribbled the word "sex."[3] Mr. Mitchell pointed to the word and asked Dr. Ensor "Can you give her something for this?" Dr. Ensor indicated to Mr. Mitchell that he could do something to help with this concern. Soon thereafter, Lynn Dunlap, R.N., entered the room and administered an injection of Depo-Testosterone to Mrs. Mitchell. Mr. Mitchell testified that Dr. Ensor failed to discuss the purpose or contents of the injection with either plaintiff. Most significantly, plaintiffs allege that Dr. Ensor failed to notify Mrs. Mitchell of the known side effects of Depo-Testosterone, specifically clitoromegaly.

In his deposition and direct testimony, Dr. Ensor paints a distinctly different portrait of the events leading up to the injection. Dr. Ensor testified that after his examination of Mrs. Mitchell, he was approached by Mr. Mitchell. While standing in the entryway to the examining room, Mr. Mitchell pointed to the "sex" reference scribbled on the card. Dr. Ensor testified that Mr. Mitchell expressed concern with regard to his wife's developing asexuality, and asked if there was anything Dr. Ensor could do about this condition. Before agreeing to treat Mrs. Mitchell's diminished libido, Dr. Ensor testified that he asked Mrs. Mitchell, "Do you know what he's talking about," in reference to his conversation with her husband. According to his testimony, Dr. Ensor believed that Mrs. Mitchell was aware of the nature of her husband's concern because she was close enough to overhear the conversation. Dr. Ensor's account of the pre-injection conversation is supported by a statement in plaintiffs' Complaint that reads:

> On or about January 5, 1998, the Defendant James K. Ensor, M.D., asked the Plaintiff Patsy Mitchell how her hormones were 'doing,' to which she responded that she was experiencing a diminished libido. Thereafter, the Defendant James K. Ensor, M.D., told her that he would get her something for the problem.

Dr. Ensor further asserts, and plaintiffs dispute, that he explicitly informed Mrs. Mitchell of her husband's concern regarding her developing asexuality.

In his testimony, Dr. Ensor noted that Mrs. Mitchell nodded acknowledgment of her understanding of Mr. Mitchell's concern. Dr. Ensor admitted in his deposition that he did not warn Mrs. Mitchell about all conceivable side effects of Depo-Testosterone, instead advising his patient only with regard to the possible onset of pedal edema (swelling of the foot), gradual hair loss, and acne breakout. The record indicates that Dr. Ensor did not warn Mrs. Mitchell about clitoromegaly as a possible side effect of Depo-Testosterone.

The evidence is clear that Dr. Ensor, in response to Mr. Mitchell's request, ordered nurse Dunlap to administer a 2cc (400mg.) injection of Depo-Testosterone to Mrs. Mitchell. For

---

[3] Plaintiff Steve Mitchell testified on cross examination that he never showed the paper to his wife and that she was unaware of the fact that he intended to complain about her diminished libido to Dr. Ensor. In fact, Mr. Mitchell testified that he intentionally hid his complaint from his wife.

approximately one month following the shot, Mrs. Mitchell suffered no adverse side effects to the Depo-Testosterone. Plaintiffs' first became aware of Mrs. Mitchell's alleged negative reaction to the drug in February of 1998. While engaged in intimate relations with her husband, Mrs. Mitchell felt a "stinging" sensation in her clitoris. She asked Mr. Mitchell to look at what was causing her discomfort. At his wife's urging, Mr. Mitchell made a closer examination of Mrs. Mitchell's private region and discovered that her clitoris was enlarged to the point that it resembled a male penis.[4] Plaintiffs were alarmed by Mrs. Mitchell's condition, and telephoned Dr. Ensor's office the following day to find out the name of the injected drug. Immediately after obtaining this information, Mr. Mitchell drove to a local drug store and obtained a package insert for Depo-Testosterone.

Neither the manufacturer's package insert for Depo-Testosterone nor the discussion in the Physicians Desk Reference (PDR) were introduced as an exhibit in the case. However, the testimony elicited from all of the expert witnesses is to the effect that neither the package insert nor the PDR show clitoromegaly (clitoral enlargement) as a known side effect of the drug.

Despite the discomfort and concern Mrs. Mitchell suffered as a result of her condition, she failed to seek immediate medical attention. Mrs. Mitchell did not inform Dr. Ensor of her clitoral enlargement, nor did she return for further examination. From February of 1998 through April of 1998, Mrs. Mitchell sought the medical attention of twelve different physicians for various physical ailments unrelated to her enlarged clitoris, yet Mrs. Mitchell never revealed her condition to any of these doctors, and never sought treatment specifically for clitoromegaly. Finally, on May 12, 1998, Mrs. Mitchell sought the opinion and care of Floyd Shrader, M.D., in treating her clitoral enlargement.

Prior to her visit of May 12, 1998, Dr. Shrader had treated Mrs. Mitchell on a regular basis from 1978 until 1993. Dr. Shrader treated Mrs. Mitchell as her general physician, not as a specialist in internal medicine. The record provides that Dr. Shrader had some training in internal medicine, but was not qualified as a specialist in this area.

During direct examination, Dr. Shrader noted that his general physical examination of Mrs. Mitchell revealed that she "had developed a clitoral enlargement or a clitoral hypertrophy that measured about two inches in length, and this is a markedly enlarged clitoris." Dr. Shrader testified that it was his opinion that this condition was "directly due to the large amount of male hormone that [Mrs. Mitchell] received in the injection." Upon receiving Dr. Shrader's diagnosis, plaintiffs' sought no further medical advice or expertise regarding Mrs. Mitchell's condition.

---

[4] Mrs. Mitchell's testimony as to exactly when she began to notice side effects is inconsistent. On direct examination at trial, Mrs. Mitchell testified that she felt a "stinging" sensation when she urinated, a condition that surfaced roughly three or four weeks after the injection. However, in her deposition, Mrs. Mitchell testified that the first time she felt any pain in her clitoris was during February 1998 intercourse with her husband.

On January 4, 1999, Patsy and Steve Mitchell brought an action against Dr. Ensor, Memphis Internal Medicine, and Jane Doe,[5] alleging medical malpractice in the administration of the Depo-Testosterone injection and for failure to obtain plaintiff's informed consent for the injection of the dosage. Mr. Mitchell's claim was loss of consortium for the past and future loss of his wife's services, society, and companionship. A trial on this action commenced on April 2, 2001. Defendants moved for a directed verdict at the close of plaintiffs' proof and renewed the motion at the conclusion of all the proof. The motion was denied, and after the close of proof, plaintiffs submitted a list of twelve special jury instructions to the court. Instruction No. 10 requested the court to instruct the jury on the doctrine of informed consent, but plaintiffs' request for an informed consent instruction was denied. The case was submitted to the jury on the negligence theory of liability against the defendants for the prescription and administration of the drug. On April 12, 2001, the jury returned a verdict for defendants, and the court subsequently entered judgment on the jury verdict.

Plaintiffs filed a motion for a new trial pursuant to Rule 59.02 of the Tennessee Rules of Civil Procedure. In an order entered June 15, 2001, the trial court denied plaintiffs' motion. Patsy and Steve Mitchell have appealed, and present the following issues as stated in their brief:

1. Whether or not the court erred when it refused to instruct the jury on lack of informed consent.
2. Whether or not the court erred when it failed to strike the direct testimony of Dr. Ensor because it was not within a reasonable degree of medical certainty.
3. Whether or not the court erred when it allowed the defense expert, Jack Sanford, M.D., to present alternative causes for Mrs. Mitchell's condition that were not within a reasonable degree of medical certainty.
4. Whether or not the verdict is contrary to the weight of the evidence.

**I.**

The first issue we are asked to examine is whether the trial court erred in refusing to instruct the jury regarding the lack of informed consent. The trial court should instruct the jury upon every issue of fact and theory of the case raised by the pleadings and supported by the proof. *Street v. Calvert*, 541 S.W.2d 576 (Tenn. 1976); *Underwood v. Waterslides of Mid-America*, 823 S.W.2d 171, 178 (Tenn. Ct. App. 1991). More specifically, where a requested special instruction is a correct statement of the law, is not included in the general charge, and is supported by the evidence

---

[5] In their complaint, plaintiffs alleged that Jane Doe's administration of Depo-Testosterone was negligent because the as yet unidentified nurse knew or should have known that the injection would cause Mrs. Mitchell harm. Plaintiffs later amended the January 4 complaint to name Lynn Dunlap, R.N. as the "Jane Doe" defendant. On March 15, 2001, defendants filed a motion for summary judgment to dismiss Dunlap as a defendant in this action. Shortly thereafter, the action against Dunlap was voluntarily dismissed by plaintiffs.

introduced at trial, the court should give the instruction. ***Underwood***, 823 S.W.2d at 178. When the denial of a request which ought to have been given prejudices the rights of the requesting party, the judgment should be reversed. ***Nashville C. & St. L. Ry. Co. v. Jackson***, 187 Tenn. 202, 213 S.W.2d 116 (1948).

Despite the diligent efforts of their counsel, plaintiffs were twice denied a jury instruction on the doctrine of informed consent. The trial judge decided to omit an informed consent instruction from the general charge, voicing two specific concerns as the basis for his refusal:

> As you can see, I've bounced all over this morning, and I'm back now to saying I'm not going to give the informed consent, in part because of the uncertainty of the law as it relates to whether you could use it in medicine administration.
>
> And, two, because of the serious question that I do have as to whether the risks complained of or the damage complained of in this case is even remotely within the realm of the risks that are contemplated by the disclosure charge.

After the court's rejection of the general informed consent charge, plaintiffs' counsel presented the judge with a special instruction on informed consent and medical negligence. Acknowledging that the court had ruled on the lack of informed consent issue, counsel maintained that the instruction was necessary to address the issue of Dr. Ensor's alleged breach of the standard of care. Finding no merit to plaintiffs' counsel's distinction between the lack of informed consent and medical negligence charges, the court refused to allow the instruction. Plaintiffs' proposed instruction reads as follows:

> No. 10. Second Allegation of Negligence: 1) Lack of Informed Consent: It is the duty of a physician to obtain the consent of a patient before beginning a course of treatment. Consent may be express or it may be implied from the conduct of the parties. Failure to obtain the consent makes the physician responsible for an injury caused by the treatment even if the physician is not otherwise liable. T.P.I. 3 - Civil 6.25.
>
> Reality of Consent - duty to disclose. A physician is required to disclose the relevant information necessary to make an intelligent and informed decision regarding the proposed treatment. Disclosures required are those that physicians in good standing under similar conditions in the same or similar community would make having due regard for the patient's physical, mental and emotional condition. T.P.I. 3 - Civil 6.30.
>
> The Mitchell's also contend that Dr. Ensor failed to reasonably advise the plaintiff, Patsy Mitchell, about the

administration of a shot of 400 mg. of Depo-Testosterone and the possible masculinizing side effects of that drug, such as hair growth, deepening of the voice, clitoral enlargement, and if you find that a reasonable person, in the same position as Mrs. Mitchell, would not have consented to the injection of Depo-Testosterone if adequately informed of one or more of these possible side effects, and that the shot of testosterone was the legal cause of Mrs. Mitchell's injuries, then the plaintiffs have met their burden and proved negligence by Dr. Ensor. In your decision, you may consider the characteristics of Mrs. Mitchell, including her idiosyncrasies, fears, age, and medical condition. T.P.I. 3 - Civil 3.50 Modified; ***Ashe v. Radiation Oncology Assocs.***, 9 S.W.3d 119 (Tenn. 1999); ***German v. Nichopoulos***, 577 S.W.2d 197 (Tenn. Ct. App. 1978), ***overruled on other grounds***.

In determining whether the trial judge erred in denying plaintiffs' request for an informed consent instruction, we must first ascertain whether the proposed jury instruction was a correct statement of the law. The trial judge, in explaining his decision to deny plaintiffs' instruction, noted that he was not convinced that this case even involved the issue of informed consent.

Plaintiffs' instruction generally outlines a medical malpractice action premised on the doctrine of informed consent and appears to be a correct statement of the law.

T.C.A. § 29-26-118 provides:

> **Proving inadequacy of consent.** - In a malpractice action, the plaintiff shall prove by evidence as required by § 29-26-115(b) that the defendant did not supply appropriate information to the patient in obtaining informed consent (to the procedure out of which plaintiff's claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which the defendant practices and in similar communities.

In ***Ashe v. Radiation Oncology Assocs.***, 9 S.W.3d 119,121 (Tenn. 1999), the Court distinguished a lack of informed consent claim from a medical battery claim involving the performance of an unauthorized medical procedure. According to the Court, "[a] lack of informed consent claim typically occurs when the patient was aware that the procedure was going to be performed but the patient was unaware of the risk associated with the procedure." ***Id***. (quoting ***Blanchard v. Kellum***, 975 S.W.2d 522, 524 (Tenn. 1998)). Tennessee courts have consistently recognized the distinction drawn in ***Ashe*** that a physician's failure to inform a patient of risks associated or inherent in the treatment provides the foundation for a lack of informed consent claim.

*See Church v. Perales*, 39 S.W.3d 149, 159 (Tenn. Ct. App. 2000); *Mitchell v. Kayem*, 54 S.W.3d 775, 779 (Tenn. Ct. App. 2001).

It is well established in Tennessee that an objective standard is to be applied in assessing causation in medical malpractice informed consent cases. *See Ashe*, 9 S.W.3d at 123-24. Under the objective standard, the court must consider informed consent from the perspective of a reasonable person in the patient's position, and whether "a reasonable person in the patient's position would have consented to the procedure or treatment in question if adequately informed of all significant perils." *Id.* at 124. As drafted, plaintiffs' charge properly instructs the jury to apply an objective standard in assessing whether informed consent was present.

The record indicates that the trial court refused to charge on the doctrine of informed consent for two reasons: (1) the doctrine of informed consent does not apply to therapeutic treatment as announced in *Cary v. Arrowsmith*, 777 S.W.2d 8, 21 (Tenn. Ct. App. 1989); and (2) for lack of proof the defendants were not required to inform of the risk of the plaintiffs' resulting injury.

The plaintiff in *Cary* brought a malpractice action against a treating physician for negligence and failure to obtain plaintiff's informed consent to radial keratotomy surgery. *Id*. at 10. Adopting the rational articulated in a Pennsylvania Superior Court decision, the Tennessee Court of Appeals, Middle Section concluded that plaintiff's issue of whether the trial court erred by refusing to allow the jury to consider informed consent, on the basis that the "use of prescription medications ordered for the care and treatment of a patient by his physician cannot form the basis for an action against the physician for lack of informed consent," was without merit. *Id*. at 21. The court's ruling on this issue was rooted in the following excerpt from the Pennsylvania decision.

> To now expand the doctrine's current applicability to cases involving the administration of therapeutic drugs would be to radically depart from, and indeed obliterate, the foundation upon which the [battery theory of informed consent] stands. Not only are we unpersuaded that such expansion is unnecessary...
>
> [W]e are also of the particular opinion that, in the light of the day-to-day realities of providing professional medical care, traditional medical malpractice actions, sounding in negligence, are an adequate legal medium for compensating patients for the injurious consequences of therapeutic drug treatment.

*Id*. (quoting *Boyer v. Smith*, 345 Pa. Super. 66, 497 A.2d 646, 649 (Pa. Super. Ct. 1985)).

The court concluded its examination of the informed consent instruction issue by adopting a modified version of the Pennsylvania Superior Court's rule:

> We are of the opinion that the better rule is that a treating physician must obtain the patient's informed consent for the medical treatment of the patient and not for each component part of the treatment process. The patient has an adequate legal remedy, *i.e.*, a malpractice action sounding in negligence, for the injurious consequence of therapeutic drug treatment.

*Cary*, 77 S.W.2d at 21.

After reviewing *Cary* and *Boyer*, we cannot agree with defendants' argument that the doctrine of lack of informed consent is strictly limited to operative surgical procedures. In *Boyer*, the court's limitation of the doctrine was premised on its interpretation of the Pennsylvania Supreme Court's decision in *Gray v. Grunnagle*, 423 Pa. 144, 155, 223 A.2d 663 (Pa. 1966). The court interpreted *Gray* as a decision by the Pennsylvania Supreme Court to expressly ground "its adoption of the informed consent doctrine upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery." *Boyer*, 345 Pa. Super. 66, 497 A.2d at 649 (construing *Gray*, 423 Pa. 144, 155, 223 A.2d 663 (Pa. 1966)). According to the court, "to now expand the doctrine's current applicability to cases involving the administration of therapeutic drugs would be to radically depart from, and indeed obliterate, the foundation upon which the *Gray* decision stands." *Boyer*, 345 Pa. Super. 66, 497 A.2d at 649 (construing *Gray*, 423 Pa. 144, 155, 223 A.2d 663 (Pa. 1966)).

As noted, the evidence in the record indicates that Mrs. Mitchell's primary claim is one of lack of informed consent. Our Supreme Court has distinguished the claims of battery and lack of informed consent, in *Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d 119, 121 (Tenn. 1999). Our Supreme Court stated:

> This Court recently enunciated a distinction between a lack of informed consent case and a pure medical battery case. In *Blanchard v. Kellum*, 975 S.W.2d 522 (Tenn. 1998), this Court defined a medical battery as a case in which a doctor performs an unauthorized procedure. *Id.* at 524. A medical battery may typically occur when: (1) a professional performs a procedure that the patient was unaware the doctor was going to perform; or (2) the procedure was performed on a part of the body other than that part explained to the patient (i.e., amputation of the wrong leg). *Id*. A lack of informed consent claim typically occurs when the patient was aware that the procedure was going to be performed but the patient was unaware of the risk associated with the procedure. *Id.*

*Id.* at 121.

It is at least questionable if *Cary,* in reliance upon *Boyer*, is applicable to the case at bar. As stated by the Pennsylvania Superior Court, Pennsylvania's limitation of the doctrine of informed consent is grounded in the theory that performance of a medical procedure without consent is a battery. We conclude that *Cary* is not controlling and an action for lack of informed consent in malpractice actions premised on a physician's failure to advise of associated treatment risks is not foreclosed. Moreover, the court stated its rule to require a treating physician to obtain a patient's informed consent for medical treatment, but not for each component part of the treatment process. *Cary v. Arrowsmith*, 777 S.W.2d 8, 21 (Tenn. Ct. App. 1989). The court proceeded to assert that a patient who sustains injury from therapeutic drug treatment has a "malpractice action sounding in negligence." The *Cary* Court appears to limit its ruling to cases where the treatment process at issue consists of multiple, distinct component parts.

We also note that several cases in Tennessee succeeding *Cary* have incorporated language suggesting that informed consent applies to both operative procedures and the administration of medication. *See Shadrick v. Coker*, 963 S.W.2d 726, 732 (Tenn. 1998) ("Accordingly, the law recognizes that a health care provider, such as a physician or surgeon, who proposes a treatment or surgical procedure has a duty to provide the patient with enough information about the nature of the treatment or procedure involved to enable the patient to make an intelligent decision and thereby give an informed consent to the treatment or procedure.") (citation omitted); *Housh v. Morris*, 818 S.W.2d 39, 41 (Tenn. Ct. App. 1991) ("A cause of action based on the lack of informed consent stems from the basic premise that a patient should be allowed to form an intelligent choice about the surgical and/or treatment procedures that he/she undertakes.") (citations omitted); *Bryant v. McCord*, No. 01A01-9801-CV-00046, 1999 WL 10085, at \*7 (Tenn. Ct. App. Jan. 12, 1999) ("It is well established in Tennessee that a physician has a duty to obtain the informed consent of his or her patient before administering a treatment or performing a surgical procedure on the patient.") (citations omitted). While none of these cases specifically deal with therapeutic drug treatment or the administration of medication, we can infer that the carefully chosen language of these courts evinces an intent that the doctrine of informed consent can be applied to cases involving the administration of medication as well as surgical procedures.

As noted, the trial court also refused to charge the jury on the doctrine of informed consent, because the proof did not warrant such a charge.

"When the health care provider performs the treatment or procedure without the requisite informed consent of the patient, liability attaches for the *resulting injuries* regardless of whether those injuries resulted from negligence." *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn. 1998) (emphasis supplied). In *Shadrick*, the Court said:

> This is not to suggest, however, that a health care provider is
> required to enumerate in detail every aspect of the proposed treatment
> or procedure or discuss every possible thing that might go wrong in
> an effort to obtain the patient's informed consent. "In the first place,
> to do so is humanly impossible. In the second place, if all the gory

-11-

details of a proposed surgery were graphically explained to every patient and all possible medical maladies that might result were enumerated we doubt that a lay person would have the stomach to listen to it all; and if the patient did, would probably be in such a fearful state that no rational decision could be made." ***Longmire v. Hoey***, 512 S.W.2d 307, 310 (Tenn. Ct. App. 1974). Accordingly, health care providers are generally not required to disclose risks that are not material, such as those that are extremely unlikely to occur or one that a reasonable patient would not care to know due to its insignificance; risks that are obvious or already known by the patient; risks that are unforeseeable or unknowable; or where the patient's medical condition renders discussion of the risks and benefits of the treatment or procedure impossible or medically inadvisable, such as in an emergency where the patient is unconscious or otherwise incapable of consenting, or where full disclosure would be detrimental to the patient's total care, i.e., the patient is unduly alarmed or apprehensive to start with and additional information would overload the patient and jeopardize his or her physical or emotional well-being.

963 S.W.2d at 733 (citations omitted).

In the instant case, the proof established that an enlarged clitoris has never been reported as a side effect in medical literature as a result of one injection of any strength of testosterone. The experts that testified on behalf of the defendant noted that they had never seen or known of such a side effect occurring from such a procedure. The plaintiffs' expert, Dr. Shrader, agreed that he was not able to find any medical literature that described a case such as the present case and characterized the plaintiff's condition as "a rare condition." Dr. Shrader did not testify that it was essential that the plaintiff be advised of clitoral enlargement in order for her to consent to the treatment. We quote from his cross-examination in the record:

> Q. The standard of care does not require a physician to list each and everything that's possible because it's a multitude of things, right?
>
> A. That is correct.
>
> Q. So what you do is explain the likely risks?
>
> A. That's correct.
>
> Q. Not something that occurs rarely or only one time in a thousand?

A. That's correct. But, again, the standard of care requires that you, you know, when you initiate a drug that you do this. And in Mrs. Mitchell's case, it was not done. She wasn't informed of any risks of the Depo-Testosterone.

Q. If the condition is as rare as you say it is, Doctor, no physician would warn a patient of that?

A. But you do it in the general way of if you're going to give a male hormone to a female. It behooves us to say this is a male hormone, these are male things that may happen to you. Now, no, I'm not saying I would tell every one of my patients you're going to have a clitoris that grows two and a half inches, but I would tell them of the hair, the male changes.

And in my experience, over 30 years now, in dealing with a lot of women in menopause, you tell them the male things and if they – most of them will not want to take the drug in the first place. And then those who do choose the drug, discuss it with them, what kind of male things. So that's how you get informed consent.

Under the state of the record before us, we conclude that the trial court correctly denied plaintiffs' special request for instruction concerning the lack of informed consent.

## II.

In their second issue for review, plaintiffs ask us to determine whether the trial court erred when it failed to strike the direct testimony of Dr. Ensor regarding the applicable standard of care, and whether or not he breached this standard because the testimony was not based on a reasonable degree of medical certainty. Plaintiffs further assert that the trial court improperly re-opened direct examination, after plaintiffs' motion to strike, to allow defendants to correctly found Dr. Ensor's testimony on a reasonable degree of medical certainty. Plaintiffs contend that Dr. Ensor's testimony about the standard of care and his alleged breach of the standard was drawn from outside expertise and experience, and not solely from his treatment of Mrs. Mitchell. On this basis, plaintiffs argue that Dr. Ensor was testifying as an expert, not as the treating physician, and therefore, his testimony must have been premised upon a reasonable degree of medical certainty.

After reviewing plaintiffs' objection at trial and their presentation of this issue in their brief, we are persuaded that plaintiffs' argument is premised not on whether Dr. Ensor was entitled to testify as to the applicable standard of care or his alleged breach, but solely on the assertion that he failed to incorporate the magic words "to a reasonable degree of medical certainty" into his testimony. While we agree that an expert in a medical malpractice case is not allowed to base

causation opinions upon possibility or pure speculation, use of the "magic language" that the opinion is to a reasonable degree of medical certainty is not necessary for admissibility.

A pair of workers' compensation opinions decided by a Special Workers' Compensation Appeals Panel of the Tennessee Supreme Court guide our decision. In **Kayser-Roth Hosiery, Inc. v. Johnson**, No. 03S01-9212-CH-00109, 1994 WL 901454, at *1 (Tenn. Sp. Workers Comp. Apr. 5, 1994), the defendant appealed a trial court decision on the sole issue of whether the evidence presented at trial was sufficient to establish the cause and permanency of defendant's injury and whether the trial court should have allowed supplemental testimony to determine the extent of impairment when the defendant's attorney failed to ask proper questions at the attending physician's deposition. Defendant asserted that he began to experience back problems as a result of his duties as an employee of plaintiff. **Id**. The attending physician in this case testified at deposition that 'it was perhaps the event at Kayser Roth that was maybe the straw that broke the camel's back." **Id**. at 4. The court attached the following footnote to the physician's statement:

> Although it has become the accepted practice for the medical expert to testify that his opinions are accurate to a 'reasonable degree of medical certainty,' there is nothing in the statute or the case law that makes the recitation of such language the sine qua non of recovery, when the medical evidence and other testimony sufficiently establish causation.

**Id**. at *4 n.4.

The court considered the physician's testimony as support for its finding "that the medical and lay evidence in the record is sufficient to establish causation and that the medical testimony in the record is sufficient to determine that the disability is permanent." **Id**. at *3-4.

The panel's decision in **Breeden v. Universal Bedroom Furniture, LTD.**, No. 03S01-9808-CV-00094, 2000 WL 949364, at *1 (Tenn. Sp. Workers Comp. July 5, 2000), provides further guidance on this issue. In **Breeden**, the plaintiff-employee initiated a workers' compensation action to recover medical and disability benefits for injuries allegedly suffered as a result of an accident at defendant-employer's place of business. **Id**. at *1-2. Defendant responded by filing a motion for partial summary judgment. **Id**. at *1. Before rendering a judgment on the motion, the trial court allowed or directed the plaintiff to conduct a supplemental deposition of the attending physician, Dr. Megibow, to "see whether or not [Dr. Megibow] would state within a reasonable degree of medical certainty that the plaintiff's psychological (mental) condition was either aggravated or caused by the [alleged work] accident...." **Id**.

After reviewing Dr. Megibow's supplemental deposition testimony, the court granted defendant's motion for partial summary judgment. **Id**. at *3-4. According to its order, the trial court granted defendant's motion because Dr. Megibow failed to "use the exact phrase 'to a reasonable degree of medical certainty,'" in testifying about the cause of plaintiff's psychological injury. **Id**.

at \*4. The trial court determined that the following exchange between plaintiff's counsel and Dr. Megibow did not satisfy the reasonable degree of medical certainty standard for expert opinions.

> A.   And the question was, with any degree of medical certainty can I say this in fact is true?
> Q.   Yes.
> A.   I would say, yes, very much so.

*Id*.

On appeal, the panel found that the trial court erred in granting defendant's motion for partial summary judgment. *Id*. at \*6. Asserting that the Tennessee Court of Appeals has never clearly enunciated whether the "magic words" must be uttered by an expert physician in order to allow the admission of his or her testimony, the panel relied upon a dissenting opinion from a medical malpractice case and an opinion from the Tennessee Court of Criminal Appeals to find that the trial court improperly granted defendant's motion. *Id*. at \*4-6. The court cited the following passage from Judge William Koch's dissenting opinion in *Moore v. Walwyn*, No. 01A01-9507-CV-00295, 1996 WL 17143, at \*12 (Tenn. Ct. App. Jan. 19, 1996) (Koch, J., dissenting):

> This Court has admonished lawyers to couch their medical expert's conclusions in the language of T.C.A. § 29-26-115 in order to avoid just the sort of interpretive disputes that are involved in this case. *Gambill v. Middle Tennessee Medical Centr.*, 751 S.W.2d 145, 148 (Tenn. Ct. App. 1988). Careful practitioners have heeded this advice, but it is not always possible to frame expert conclusions in the precise words of the statute because of differences in the medical and legal vocabularies and frames of reference.
>
> Tennessee Code Annotated § 29-26-115 is not 'holy writ,' and it should never be so rigidly applied that it requires the ritualistic incantation of its precise terms in order to permit an injured party to maintain a malpractice claim against a health care provider. The courts should expect substantial adherence to the language of T.C.A. § 29-26-115 but should never abandon their judicial powers of reasonable interpretation and construction.

*Breeden*, 2000 WL 949364, at \*5 (quoting *Moore*, 1996 WL 17143, at \*12).

The court also relied on Judge Wade's opinion in *State of Tennessee v. Young*, No. 01C01-9605-CC-00208, 1998 Tenn. Crim. App. LEXIS 566, at \*1 (Tenn. Crim. App. May 22, 1998), as support for the conclusion that the admissibility of expert medical testimony does not hinge on the utterance of seven magic words.

In criminal cases, experts have at times testified to the cause of injuries or other conditions close 'to a reasonable degree of medical certainty.' However, nothing in Tennessee law requires that those or any other specific words be recited in order for expert testimony to be admissible.

*Breeden*, 2000 WL 949364, at \*6 (quoting *Young*, 1998 Tenn. Crim. App. LEXIS 566, at \*62-63).

It is settled law in Tennessee that "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp.,* 955 S.W.2d 257, 263 (Tenn. 1997). The ruling of a trial court on any or all of these questions may only be overturned on appeal where there is a proven abuse of discretion. *Id*. On the basis of the law set forth above, we find that a medical expert is not required to explicitly state that his opinion is "to a reasonable degree of medical certainty." Therefore, we hold that the trial judge did not commit an abuse of discretion when he overruled plaintiffs' motion to strike the testimony of Dr. Ensor relating to the applicable standard of care and his alleged breach of this standard. The trial judge did not err or commit an abuse of discretion by re-opening direct examination to permit defendants the opportunity to establish Dr. Ensor's testimony to a reasonable degree of medical certainty.

Plaintiffs' second issue is without merit.

### III.

The third issue for review is whether the trial court committed an abuse of discretion by allowing defense expert, Dr. Sanford, to testify as to alternate causes of Mrs. Mitchell's condition. Plaintiffs argue that Dr. Sanford's testimony was speculative, and therefore not within a reasonable degree of medical certainty as required. In their brief to this court, plaintiffs specifically assert that (1) Dr. Sanford's "speculative" opinions did not substantially assist the trier of fact pursuant to Tennessee Rule of Evidence 702 because he did not have an opinion as to the actual cause of Mrs. Mitchell's condition and such opinions lacked the requisite scientific basis mandated by Tennessee Rule of Evidence 703; (2) the trial judge incorrectly reasoned that Dr. Sanford's alternate causes testimony was presented, not to persuade the jury that one of the alternate causes was the actual cause of Mrs. Mitchell's condition, but only to educate the jury as to the context of the scientific evidence surrounding the condition at issue; and (3) the judge's limiting instruction was insufficient to overcome the prejudice suffered by plaintiffs as a result of the admitted testimony.

Tennessee Rule of Evidence 702 permits an expert to testify "in the form of an opinion or otherwise," only where the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Tenn. R. Evid. 702. Rule 703 requires an expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703.

Plaintiffs assert that Dr. Sanford's admission that he did not know the specific cause of Mrs. Mitchell's condition rendered the expert's testimony speculative, and therefore incapable of substantially assisting the jury. Further fueling plaintiffs' argument is their belief that Dr. Sanford's "alternate cause" theories were trenched in possibility rather than probability. Plaintiffs contend that "[a] doctor's testimony that a certain thing is *possible* is no evidence at all." *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985) (quoting *Palace Bar, Inc. v. Fearnot*, 269 Ind. 405, 381 N.E.2d 858, 864 (Ind. 1978)) (emphasis supplied). "The mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion." *Lindsey*, 689 S.W.2d at 862 (quoting *Kirschner v. Broadhead*, 671 F.2d 1034, 1039 (7th Cir. Ind. 1982)).

We disagree with plaintiffs' assertion that Dr. Sanford's opinions as to alternate causes amounted to inadmissible speculation. Additionally, we take issue with plaintiffs' classification and interpretation of Dr. Sanford's testimony as alternate cause theory aimed at convincing the jury that one of the causes addressed was accountable for Mrs. Mitchell's condition. While it is undisputed that Dr. Sanford did not have an opinion, based on a reasonable degree of medical certainty, as to the exact cause of Mrs. Mitchell's enlarged clitoris, his opinions were not offered to prove causation in this case. We agree with the judge's interpretation of Dr. Sanford's testimony, whereby he noted:

> So, if that be the case, then it would put the defense in the posture of saying, well, we don't know what caused it, period, and I don't know if that's fair in terms of the evidence, because while they don't know what caused it, this expert has some scientific opinions as to possible causes, not that he is trying to convince the jury as to these being possible causes, but he is trying to educate the jury to the current knowledge from his perspective as a scientist as to how this condition might arise – not to convince them of the ultimate fact, but simply to put it into context the nature of this scientific phenomenon.

Our classification of Dr. Sanford's alternate cause testimony as being rendered for the sake of bringing to light other potential explanations for Mrs. Mitchell's condition, but not to prove ultimate causation, is supported by Dr. Sanford's trial responses. At no point during his direct or cross examination testimony did Dr. Sanford assert or opine that Mrs. Mitchell's clitoral enlargement was caused by the alternate causes to which he testified. Dr. Sanford testified that clitoral enlargement is the known potential result of late onset congenital adrenal hyperplasia, the overproduction of androgens by the ovaries, or an ovarian tumor. He discussed each of these conditions generally, but never specifically associated Mrs. Mitchell's clitoral enlargement with any of these causes.

The case law cited by plaintiffs to support their argument that Dr. Sanford's testimony was inadmissible speculation is distinguishable from the case at bar. In their brief, plaintiffs rely heavily on the law set forth in *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856 (Tenn. 1985). In *Lindsey*, the attending physician was questioned at trial about whether immediate medical care could

have prevented plaintiff's death. *Id*. at 861. The Tennessee Supreme Court deemed the following testimony speculative and inadmissible.

> Q. All right, do you hold any opinions as to whether or not a delay of any specified period of time would have made any difference in the final analysis?
>
> A. I can only speculate because we don't have the final information which an autopsy would have provided as to where exactly the injury to the brain was, how excessive it was and whether it was an injury which would – in any event be nonsurvivable, whether it would be just a few hours or maybe a day or two.

*Id*.

The physician's testimony in *Lindsey* is directed at the actual cause or aggravation of plaintiff's injuries. Counsel specifically asked the expert to offer his opinion as to whether immediate medical aid could have prevented plaintiff's death. *Id.* Because the physician was unable to introduce evidence to afford a reasonable basis for his opinion, the Supreme Court ruled the testimony inadmissible. *Id.* at 862.

Plaintiffs also cite in their brief to the cases of *Primm v. Wickes Lumber Co.*, 845 S.W.2d 768 (Tenn. Ct. App. 1992), and *Reel v. Crawley*, 1994 WL 399566, at *1 (Tenn. Ct. App. Aug. 2, 1994). In each of these cases, the court found the testimony of the physician expert inadmissible because it offered little more than a possibility upon which the jury could speculate. *See Primm*, 845 S.W.2d at 771; *Reel*, 1994 WL 399566, at *2. However, in both cases, the physician expert was specifically asked whether the two events at issue were causally connected. *See Primm*, 845 S.W.2d at 769-770; *Reel*, 1994 WL 399566, at *1 ("Doctor, do you associate Mr. Reel's irregular heartbeat in any fashion to the accident, the trauma or stress of that accident?"). Both physicians responded with vague explanations of causation. *See Primm*, 845 S.W.2d at 769-770; *Reel*, 1994 WL 399566, at *1 ("I think that irregular heart rhythms can develop due to any form of stress and being in an automobile accident could have contributed to him having more irregular heart rhythms.").

Unlike the testifying physicians in *Lindsey*, *Primm*, and *Reel*, Dr. Sanford was never asked, and never offered, his opinion as to whether Mrs. Mitchell's enlarged clitoris was causally connected to the alternate causes he addressed on direct examination. This distinction prevents Dr. Sanford's testimony from crossing the line of inadmissible opinion drawn in the aforementioned cases.

The precise point in plaintiffs' assertion of error was considered by the Court of Appeals of Kentucky in *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210 (Ky. Ct. App. 2001). *Sakler* is a medical malpractice case by the plaintiffs for Mrs. Sakler's vocal cord paralysis which was claimed to be caused by the negligence of the defendant in the use of an intubation tube during surgery. After a jury trial, the jury returned a verdict for the defendant, and on appeal the Sakler's

first argument "is that the trial court committed reversible error by permitting a defense expert witness to render an expert medical opinion based on 'speculation' and 'possibility' rather than reasonable medical probability." *Id.* at 212.  The defense expert testified that there were multiple conditions that could cause vocal cord paralysis and there is a possibility that any one of a number of these things caused the problem.  The plaintiffs argued that the opinion of a medical expert must be based on reasonable medical probability and not speculation.  The Court affirmed the ruling of the trial court that the expert testimony at issue was admissible on behalf of defendant in a medical malpractice case.  In so holding, the Court said:

> We conclude that defendants in medical malpractice actions may introduce expert witness testimony to rebut a plaintiff's expert witness testimony couched in terms of "reasonable medical probability," even though the defendant's expert witness's testimony is couched only in terms of "possibility."  In so deciding, we are persuaded by the reasoning of the United States Court of Appeals for the First Circuit in the case of ***Wilder v. Eberhart***, 977 F.2d 673 (1st Cir. 1992), cert. denied 508 U.S. 930 113 S. Ct. 2396, 124 L. Ed. 2d 297 (1993).

> In ***Wilder***, a plaintiff patient filed suit against her defendant doctor and clinic for medical malpractice, alleging the doctor's surgical procedure caused her to suffer an esophageal injury.  At trial, the plantiff's expert witness testified that her injury was caused by the defendants' medical negligence.  Expert medical testimony on behalf of the defendants, however, was ruled inadmissible by the trial court because it could not be expressed in terms of "probability" as distinguished from "medical possibility."  In holding the trial court erred in excluding this testimony, the First Circuit reasoned as follows:

>> Proximate causation between negligence and the injury complained of in a medical malpractice case must be established by expert testimony.  (Citation omitted.)  On the other hand, the defendant need not disprove causation.  Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence. (Citation omitted.)  As the New Hampshire Supreme Court recently stated in Tzimas [v. ***Coiffures by Michael***, 135 N.H. 498, 606 A.2d 1082, 1084 (N.H. 1992)], the plaintiff in a negligence action bears the burden of producing evidence "to prove that it is more likely than not that [plaintiff's] injury was "caused by the defendant's negligence.

(Citation omitted.) Defendant need not prove another cause, he only has to convince the trier of fact that the alleged negligence was not the legal cause of injury. (Citation omitted.) In proving such a case, a defendant may produce other "possible" causes of the plaintiff's injury. These other possible causes need not be proved with certainty or more probably than not. To fashion such a rule would unduly tie a defendant's hands in rebutting a plaintiff's case, where as here, plaintiff's expert testifies that no other cause could have caused plaintiff's injury. The burden would then shift and defendant would then bear the burden of positively proving that another specific cause, not the negligence established by plaintiff's expert, caused the injury. Certainly, this is much more than what should be required of a defendant in rebutting a plaintiff's evidence.

Were we to accept plaintiff's argument that once a plaintiff puts on a prima facie case, a defendant cannot rebut it without proving another cause, the resulting inequities would abound. For example if ninety-nine out of one hundred medical experts agreed that there were four equally possible causes of a certain injury, A, B, C and D, and plaintiff produces the one expert who conclusively states that A was the certain cause of his injury, defendant would be precluded from presenting the testimony of any of the other ninety-nine experts, unless they would testify conclusively that B, C, or D was the cause of injury. Even if all of defendant's experts were prepared to testify that any of the possible causes A, B, C or D, could have equally caused plaintiff's injury, so long as none would be prepared to state that one particular cause, other than that professed by plaintiff more probably than not caused plaintiff's injury, then defendant's experts would not be able to testify at all as to causation.

*Wilder*, 977 F.2d at 676-677. n5 We agree with the First Circuit that expert testimony of this nature is admissible on behalf of defendants in medical malpractice cases in order to rebut the testimony of plaintiffs upon whom the burden of proof rests.

*Id.* at 213-214.

The opinion in *Wilder* is well reasoned and we, like the Kentucky Court of Appeals in *Sakler*, are persuaded by this reasoning. Accordingly, we adopt the holding expressed in *Wilder* and *Sakler* as dispositive of this issue.

**IV**

The final issue presented for review is whether the jury's verdict was contrary to the weight of the evidence.

In *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698 (Tenn. 2000), our Supreme Court reiterated the long established rule concerning review of a jury verdict. The Court said:

> The standard of appellate review when reviewing a jury verdict approved by a trial court is whether there is any material evidence to support the verdict. Tenn. R. App. P., Rule 13(d). When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence. *Crabtree Masonry Co. v. C & R Constr., Inc.,* 575 S.W.2d 4, 5 (Tenn. 1978); *Black v. Quinn*, 646 S.W.2d 437, 439-40 (Tenn. Ct. App. 1982). Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury." *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Id.* at 704-705.

There is material evidence in this record to support the jury's verdict and, accordingly, we find this issue without merit.

The judgment of the trial court on the jury verdict is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed to the appellants, Patsy Mitchell and Steve Mitchell, and their surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.

-21-