IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2003 Session

## SHERRY HUNTER, As Administratrix of the Estate of LAWRENCE HUNTER, Deceased v. JAY MICHAEL URA, ET AL.

**A Direct Appeal from the Circuit Court for Davidson County**
**No. 96C-3784     The Honorable Marietta M. Shipley, Judge**

_____

**No. M2002-02573-COA-R3-CV - Filed October 28, 2003**

_____

Administratrix of estate of deceased husband filed wrongful death action against defendants anesthesiologist and anesthesia services group. Jury returned a verdict for plaintiff, finding defendants at fault and awarding damages for medical and funeral expenses, and the pecuniary value of the life of the deceased including loss of consortium of wife and children. Defendants appeal, raising several procedural and evidentiary issues for consideration. We vacate and remand.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

E. Reynolds Davies, Jr., Ed R. Davies, Nashville; Daniel D. Warlick, Nashville - For Appellants, Jay Michael Ura, M.D. and Nashville Anesthesia Services

Gary K. Smith, C. Philip M. Campbell, Memphis, For Appellee, Sherry Hunter

**OPINION**

The deceased, Mr. Lawrence Hunter ("Husband"), was admitted to the Columbia Southern Hills Medical Center on October 27, 1995, to undergo an arthroscopy of his right shoulder.[1] Prior to the operation, Dr. Stephen J. Obermeier ("Dr. Obermeier") administered an interscalene nerve block.

On October 17, 1996, Plaintiff, Sherry Hunter, as Administratrix of the Estate of Lawrence Hunter, deceased, filed a Complaint for wrongful death against the Defendants, Jay Michael Ura ,

---

[1] The scheduled procedure was described as an "out-patient procedure" in plaintiff's complaint.

M.D. ("Dr. Ura"); Stephen J. Obermeier, M.D.; Susan Moyers, CRNA; Nashville Anesthesia Services ("NAS"); H.C.A. Health Services, Inc.; H.C.A. Health Services of Tennessee, Inc., d/b/a Columbia Southern Hills Medical Center, and Columbia Southern Hills Medical Center.[2]

The Complaint avers that the operation was "initiated as an arthroscopy of the right shoulder and intraoperatively converted to an open rotator cuff repair." During the surgery, Dr. Ura administered a general anesthesia to the patient. Upon completion of the operation, the "anesthesia team" was unable to awaken Husband. Continued post-operative efforts to awaken the patient proved unsuccessful and, on November 1, 1995, Husband was declared brain dead. At the time of his death, the deceased was a 49-year-old executive with Nissan Motor Manufacturing Corporation, U.S.A., and the father of two minor sons. The Complaint alleges, among other thing:

> Plaintiff alleges that Plaintiff's decedent suffered, in conjunction with the operative procedure, a diffuse hypoxic insult to the brain. Said loss of oxygen to the brain was the direct and proximate cause of Plaintiff's decedent's death and said hypoxic episode was due to and directly and proximately caused by the negligence of the Defendants, Ura, Obermeier, Moyers, CRNA, as well as other employees or agents of the Defendant Hospital staff.
>
> Plaintiff alleges that the Defendants, their agents/employees, were negligent and that the professional services rendered to Plaintiff's decedent fell below acceptable standards of professional practice including, but not limited to the following:
>
> a. Failing to provide appropriate informed consent or adhere to consent given by the patient and as such, the administration of general anesthesia constitutes assault and battery resulting in the death of Plaintiff's decedent;
>
> b. Failing to properly monitor and/or accommodate proper monitoring of Plaintiff's decedent preoperatively and intraoperatively;
>
> c. Failing to diagnose in a timely fashion loss of oxygen to Plaintiff's decedent's brain when reasonable care, had it been exercised, would have indicated that Plaintiff was suffering from cerebral hypoxia;
>
> d. Failing to take appropriate steps to prevent cerebral hypoxia;

---

[2] Plaintiff voluntarily dismissed the suit against Defendant Moyers and summary judgments were granted to the remaining Defendants, except Defendants, Jay Michael Ura, M.D., and Nashville Anesthesia Services.

e. Failure to take appropriate steps to resolve existing cerebral hypoxia before significant and ultimately fatal brain damage occurred;

f. Failure to exercise reasonable and ordinary care under the circumstances; and

g. Failure to follow acceptable standards of professional practice under the circumstances while providing medical services to Plaintiff's decedent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The negligence of the Defendants, their agents, servants and employees, including, but not limited to those acts set forth above, were the direct and proximate cause of Plaintiff's decedent's death and the physical and mental pain and suffering sustained by Plaintiff's decedent prior to death.

The Complaint seeks judgment for damages for (1) the pecuniary value of the deceased's life; (2) physical and mental pain and suffering incurred by the deceased prior to death; and (3) "[v]alue of services to be provided by [deceased] to Plaintiff and Plaintiff's minor children." On these grounds, Plaintiff prayed for a judgment against defendants in the amount of $15,000,000.00 "plus pre-judgment interest, discretionary costs and all other allowable costs."

On October 28, 1998, Plaintiff filed a Motion to Amend Complaint adding a claim for loss of consortium damages and a claim for punitive damages in the amount of $45,000,000.00. Defendants' response to Plaintiff's motion objected to the inclusion of a claim for punitive damages but did not object to Plaintiff's loss of consortium claims. The trial court allowed the amendment only as to the loss of consortium claims.

By Order entered February 27, 2001, the case was set for a jury trial to begin September 10, 2001. On May 2, 2001, Plaintiff filed a Motion in Limine seeking to preclude defendants "from offering expert testimony as to the causation or "possible" causation of the injuries or death of Plaintiff's decedent from occlusion of the carotid artery(ies)...." The trial court entered a Memorandum Opinion on July 2, 2001, addressing Plaintiff's motion to preclude defense expert testimony regarding the aforementioned "carotid artery occlusion theory." As the basis for its opinion, the court examined the deposition testimony of defense experts, Dr. Michael Hays ("Dr. Hays"), Dr. John Eichhorn ("Dr. Eichhorn"), and Dr. Ballard Wright ("Dr. Wright") with regard to the carotid artery occlusion theory, noting:

The doctors that have set forth the "carotid artery occlusion theory" posit that three simultaneous events caused the death of Mr. Hunter.

-3-

The three events are (1) a left styloid process sufficiently elongated to occlude the left carotid artery, (2) a turning of Mr. Hunter's head to the left during the surgery, and (3) an interscalene block which colluded the right carotid artery.

Upon examination of the individual deposition testimony of each doctor, the court granted Plaintiff's motion as to Dr. Hays, finding that his testimony "while within the realm of scientific possibility, falls short of the strictures of legal probability necessary to be an admissible expert opinion." With regard to defense experts Dr. Eichhorn and Dr. Wright, the court expressed "some concern about the admissibility" of the experts' testimony based on their depositions. However, recognizing that the experts' testimony was offered in the limited and highly scrutinized form of discovery depositions, the court decided to hold a Daubert/McDaniel hearing prior to trial to further consider the admissibility of the experts' testimony regarding the carotid artery occlusion theory.

The trial court held a Daubert/McDaniel hearing on August 30, 2001. Several months later, the court entered a Memorandum Opinion examining the question of "whether Dr. Eichhorn's testimony complies with the factors for determining reliability of scientific evidence in *McDaniel v. CSX*, 955 S.W.2d 257 (Tenn. 1997)[,] as well as the legal sufficiency of a professional opinion in *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856 (Tenn. 1985)." After determining that Dr. Eichhorn was qualified to testify as an expert, the court found that the expert "passed the initial threshold necessitated by *McDaniel*," and thereby permitted both Dr. Eichhorn and Dr. Wright, provided Dr. Wright testified "in a similar vein," to testify at trial.

On September 4, 2001, Plaintiff filed a Motion in Limine seeking to preclude defendants from "introducing or attempting to introduce into evidence or making any reference in opening or closing arguments to any collateral source payments at the trial of this case." Plaintiff filed a Memorandum of Law in support of her motion, asserting that defendants were not entitled to set-offs or credits for payments made to Plaintiff by Husband's employer in the form of insurance and death benefits, and retirement plan payouts. Plaintiff also sought to exclude introduction of social security benefits, and investment payouts.

Defendants filed Motion in Limine #10 on September 4, 2001, seeking to exclude, as substantive evidence, any learned treatise materials "that may be utilized or referred to by plaintiffs' expert witness." On April 8, 2002, defendants filed another Motion in Limine, seeking to preclude Plaintiff from introducing "proof of actual economic losses relating to loss of services and loss of earned income to the extent these losses will be paid or have been paid and replaced by monies received by Plaintiff and her children as a result of Larry Hunter's death." Alternatively, defendants moved for a set-off or credit of the above-cited amounts against any judgment rendered in favor of Plaintiff.

-4-

Defendants filed Motion in Limine #13 on April 19, 2002, renewing their application for "a total of eight (8) peremptory challenges at the time of jury selection." Defendants also moved to limit Plaintiff to four total peremptory jury challenges.

The jury trial began on April 22, 2002, and lasted through May 3, 2002. During the course of the trial, it was learned that Dr. Hays, defendants' primary causation and standard of care expert, had been diagnosed with cancer and would be unable to testify at trial due to treatment conflicts. Defendants asserted that it would be prejudicial to their case if Dr. Hays were unable to testify live at trial, and therefore moved for a mistrial.[3] The court denied defendants' motion, but permitted the parties to make arrangements to take Dr. Hays's videotaped deposition during the upcoming weekend. When the trial convened the following week, defense counsel informed the court that it did not take the videotaped deposition as planned because of concerns regarding Dr. Hays's health. Defendants thereby renewed their motion for mistrial to no avail.

At the close of trial, the jury rendered a verdict for Plaintiff against Dr. Ura and NAS, awarding Plaintiff damages in the amount of $43,950.00 for medical expenses, $11,360.64 in funeral expenses, and $5,800,000.00 for the "[p]ecuniary value of life of Larry Hunter including loss of consortium of wife and children." The jury refused to award Plaintiff damages for the "[m]ental suffering of Larry Hunter from time of injury until time of death." On May 17, 2002, the trial court entered judgment on the jury verdict in the total amount of $5,855,310.64.

Plaintiff filed a Motion for Prejudgment Interest on June 17, 2002. This same day, Defendants filed "Defendants' Motion to Set Aside Judgment And To Have A Judgment Entered In Accordance With the Motion for Directed Verdict," "Defendants' Motion for New Trial," "Defendants' Motion for Remittitur," and "Defendants' Motion to Alter or Amend the Judgment."

On October 7, 2002, the court entered an Order on the post-trial motions submitted by the respective parties. The court supported the jury's verdict finding defendants "at fault," and entered the following rulings as to the parties' post-trial motions:

> It is therefore, ORDERED as follows:
>
> 1. Defendants' motion to set aside the judgment and to have judgment entered in accordance with the motion for directed verdict is denied.

---

[3] Defense counsel acknowledged that Dr. Hays could give a videotaped deposition over the upcoming weekend, but expressed concern with regard to whether Dr. Hays would be in the proper state of mind to offer an opinion at this time.

2. Defendants' motion for new trial based upon the assignments of error in Section II, A-P, and R-S of the motion, is denied.

3. The court agrees with the jury's verdict relating to the determination of Defendants' fault and the jury's award of $2.8 million dollars for the present-day-value of the lost earning capacity of the decedent. The court disagrees with the jury's award of an additional $3.0 million dollars for loss of consortium damages, and disagrees with the jury's award of $5.8 million dollars for the pecuniary value of the life of the decedent.

4. Defendants' motion for remittitur is granted. The court suggests a remittitur in the amount of $1.5 million dollars of the judgment entered on May 17, 2002.

5. Plaintiff must file a notice with the Circuit Court Clerk accepting the suggested remittitur, accepting the suggested remittitur under protest, or rejecting the suggested remittitur within 15 days from the entry of this order. If Plaintiff fails to file such notice, or if Plaintiff rejects the suggested remittitur, Defendants' motion for new trial is granted.

6. Defendants' motion to alter or amend the judgment is denied.

**************************************************

8. Plaintiff's motion for an award of pre-judgment interest is denied.

The court further awarded defendants a set-off against the judgment entered in this case in the total amount of $426,565.00 to account for collateral source payments received by Plaintiff.[4] Plaintiff was awarded $35,468.59 in discretionary costs. Taking into account the set-offs, the court's discretionary

---

[4] The court specifically found that defendants' were entitled to the following set-offs for amounts paid on account of Mr. Hunter's death: (1) life insurance proceeds to Sherry Hunter totaling $185,000.00; (2) life insurance proceeds paid to Benjamin Hunter in the amount of $185,000.00; (3) "child's social security benefits" paid to Benjamin Hunter in the amount of $5,523.00, and Joseph S. Hunter in the amount of $42,897.00; (4) "one-time widow's social security benefit" paid to Sherry Hunter in amount totaling $255.00; and (5) social security benefits payment to Sherry Hunter in the total amount of $7,890.00.

cost award, and the suggested remittitur, the court calculated a total modified judgment in favor of

Plaintiff in the amount of $3,964,214.23.

On October 16, 2002, Plaintiff filed a Notice of Acceptance of Remittitur Under Protest. On January 10, 2003, this Court filed an Order directing plaintiff to obtain a final judgment from the trial court, as the trial court had "not yet entered an order reducing the amount of the judgment" in accordance with its suggestion of remittitur. On January 28, 2003, the trial court filed an Order stating in pertinent part:

> The court hereby reduces the May 17, 2002 judgment to reflect the accepted remittitur (under protest) and other reductions, all as more fully described in the order of October 7, 2002 the contents of which are hereby incorporated by reference.
>
> As stated in the order of October 7, 2002, the amount of the remitted final judgment in this case is $3,928,745.64, plus discretionary costs in the amount of $35,468.59, for which execution may issue if necessary.

Defendants appeal, presenting the following issues for review, as stated in their brief:

> 1. Whether the trial court erroneously awarded Plaintiff Sherry Hunter eight peremptory challenges contrary to T.C.A. § 22-3-105 which allows only four peremptory challenges per party.
>
> 2. Whether the trial court erred in denying Defendants' pre-trial motion in limine #10 relating to the exclusion of learned treatise materials resulting in the improper admission and use of hearsay treatises and other "medical literature" by Plaintiff throughout the trial.
>
> 3. Whether the trial court erred in determining that Plaintiff's out-of-state expert witness on anesthesiology and causation issues, Dr. William O. Witt, was competent to testify under T.C.A. § 29-26-115, and whether it erred by allowing Dr. Witt to testify as an expert at trial over Defendants' objections to his qualifications based upon the locality rule.
>
> 4. Whether the court erred in allowing Dr. Witt to introduce the substance of unidentified "medical literature" and/or treatise materials into evidence in violation of the rule excluding hearsay.

5. Whether the court erred by allowing Plaintiff's counsel to conduct a cross-examination of Defendants' expert witness, John Eichhorn, M.D., with statements contained in published treatises or periodicals which were never identified or established as reliable authority by any witness contrary to TRE 618.

6. Whether the court erred by permitting Plaintiff's counsel to conduct a cross-examination of Dr. Eichhorn by challenging the witness on various occasions to "cite me to one piece of medical literature" supporting his testimony contrary to the provisions of TRE 618 and 705.

7. Whether the trial court abused its discretion in denying Defendants' motion for mistrial after Plaintiff's counsel conducted an improper cross-examination of Dr. Eichhorn concerning a specific instance of prior conduct; namely, a statement allegedly attributed to the witness that he compared his role as a defense expert to that of a "prostitute," when there was no reasonable factual basis for such questioning and where Plaintiff failed to request a jury-out hearing before questioning the witness as required by TRE 608(b)(1).

8. Whether the trial court abused its discretion in denying Defendants' motions for mistrials or to continue the trial after Defendants were notified at the end of the first week of trial that a planned expert witness, Dr. Michael Hays, a local anesthesiologist in private practice in Nashville, was unavailable to testify due to the fact that he had been diagnosed with malignant lymphoma during the trial and planned to undergo immediate diagnostic tests and chemotherapy treatment.

9. Whether the trial court erred in granting Plaintiff's pre-trial motion in limine relating to Dr. Hays' anticipated expert testimony about causation of injury and the carotid artery occlusion theory.

10. Whether the trial court erred in denying Defendants' motion for directed verdict at the close of all the evidence based upon Defendants' objections to Dr. Witt's competence to testify as an expert witness under the locality rule, T.C.A. § 29-26-115.

11. Whether the trial court erred in allowing Plaintiff's counsel to argue to the jury that everything the Plaintiff claims in this case is supported by the "medical literature;" i.e., the "vast body of information that is shared among medical professionals" when, in

fact, no supporting treatises, periodicals, or literature had been identified or established as reliable authority by any witness.

12. Whether the trial court erred in allowing Plaintiff's counsel to argue to the jury that Defendants had failed to produce "any medical literature to support their version – their defense of the case," when Plaintiff even acknowledged and the court had ruled during the pre-trial hearing on motions in *limine* that introduction of medical literature into the evidence would not be permitted.

13. Whether the trial court erred in allowing Plaintiff's counsel to argue to the jury that testimony given by Plaintiff's expert witness has been "in textbooks longer than we've been alive," "that it has been in every book written on this subject during our lifetime," and that "not once in the history of medicine" had this testimony been challenged.

14. Whether the trial court erred in allowing Plaintiff's counsel to argue to the jury that in establishing the standard of care in this community, is it okay to ignore "years and years and years of collective knowledge – brilliant doctors who have practiced who have never had their opinions disputed" or "to ignore all medical knowledge that has never been drawn into question."

15. Whether the court's retrospective application of the <u>Jordan</u> decision allowing the jury to award loss of consortium damages in this case is unconstitutional as it violates Defendants' rights under Art. I, § 20 of the Tennessee Constitution, and vested rights protected by the Due Process and Equal Protection Clauses of the 14th Amendment to the Constitution of the United States.

16. Whether the court violated Defendants' guaranty to trial by jury under the Tennessee Constitution by commenting upon the evidence during the jury charge that this case was "a very interesting and difficult case," and that the jury would find Question #1 on the verdict form (were the Defendants at fault?) to be a "deceptively simple question" and one to which there was "obviously not a simple answer."

17. Whether the trial court erred by allowing Plaintiff to recover the total amount awarded by the jury for the pecuniary value of the life of the deceased where such value included economic damages which were "replaced" (within the meaning of T.C.A. § 29-26-119) by a

$1M+ death benefit paid to Plaintiff Sherry Hunter in 1996 by Nissan Motor Manufacturing Corporation (Mr. Hunter's employer).

18. Whether the cumulative effect of all the errors complained of in this appeal denied Defendants a fair trial by a fair and impartial jury.

Plaintiff raises the following additional issues, as stated in her brief:

1. Whether the trial court erred in remitting by 1.5 million dollars the jury's award for loss of consortium as a component of the pecuniary value of the life of Plaintiff's decedent Larry Hunter.

2. Whether the trial court erred in denying Plaintiff's Motion for Award of Prejudgment Interest.

The first issue for review is whether the trial court erred in allowing Plaintiff eight peremptory jury challenges. To provide a brief procedural background for this issue, we note that the trial court first considered the question of the number of allowable peremptory challenges per side at a pre-trial hearing on April 18, 2002. At this hearing, the court made no final ruling as to the number of peremptory challenges to be granted, instead remarking:

THE COURT: Now, we could look at this in a nonlegal way and just say, "Either we all get four, or well all get eight." We could do it that way.

MR. SMITH [PLAINTIFF COUNSEL]: I don't care which it is.

MR. WARLICK [DEFENDANTS' COUNSEL]: The wrongful death is a statutory cause of action, and it – there – I've tried this recently. It's a titular plaintiff. The – derivation of the –

THE COURT: There is no derivative claim here.

MR. WARLICK: Damages come out of the statute.

THE COURT: Well, I thought we could start with something easy, but I don't know where to put it on the list. Okay. Well, whether we have 4 or 8, we'll have at least 12.

The following day, defendants filed Motion in Limine #13, renewing their application for a total of eight peremptory challenges, and seeking to limit Plaintiff to four peremptory challenges.

As stated, a jury trial began on April 22, 2002. The court opened the proceedings by first addressing the issue of peremptory challenges:

> THE COURT: Okay. I guess the first issue is the number of challenges. I've decided that there's no perfect answer to this question. I'm still not clear that the practice of – that Dr. Ura is a part of –
>
> ***************************************************
>
> I'm still not clear as to whether there could be a judgment against Dr. Ura's practice. By the same token, I'm not exactly clear as to whether the son could have a different loss of consortium in the estate. So I'm sure we'll get to those questions later at trial.
>
> But I'm going to give everybody eight, and that's what we'll do on the challenges. Okay? I don't think there is a –

Defendants entered no oral objection to the court's ruling. It is further undisputed that Plaintiff's counsel exercised eight peremptory challenges during the course of jury selection.

T.C.A. § 22-3-105 (1994) establishes the number of peremptory challenges allowed per party in a civil trial. The statute provides, in pertinent part:

> **22-3-105. Peremptory challenges – Effect of consolidation of cases. –** (a) Either party to a civil action may challenge four (4) jurors without assigning any cause.
>
> (b) In the event there is more than one (1) party plaintiff or more than one (1) party defendant in a civil action, four (4) additional challenges shall be allowed to such side or sides of the case; and the trial court shall in its discretion divide the aggregate number of challenges between the parties on the same side which shall not exceed eight (8) challenges to the side, regardless of the number of parties. Even when two (2) or more cases are consolidated for trial purposes, the total challenges shall be eight (8), as herein provided.

Defendants contend that the trial court erred in allowing plaintiff eight peremptory challenges, as T.C.A. § 22-3-105 limits a single plaintiff party in a civil action to four peremptory challenges. According to defendants, Husband's estate is the sole plaintiff in this matter, and is therefore only entitled to four challenges pursuant to the statute. Moreover, defendants maintain that the trial court's decision to allow Plaintiff to exercise five challenges resulted in prejudice to the judicial process, and thereby constitutes reversible error.

-11-

When interpreting a statute, the role of the Court is to "ascertain and give effect to the legislative intent." ***Sharp v. Richardson***, 937 S.W.2d 846, 850 (Tenn. 1996). In the absence of ambiguity, legislative intent is derived from the face of a statute, and the Court may not depart from the "natural and ordinary" meaning of the statute's language. ***Davis v. Reagan***, 951 S.W.2d 766, 768 (Tenn. 1997); ***Westland West Cmty. Assoc. v. Knox County***, 948 S.W.2d 281, 283 (Tenn. 1997).

Applying the above-cited principles of statutory construction, we find that T.C.A. § 22-3-105(a) plainly limits a single party plaintiff or defendant in a civil action to four peremptory challenges. The statute is free of ambiguity, and we are thus unwilling to depart from the "natural and ordinary" meaning of the statute's language. ***Cf. Tuggle v. Allright Parking Sys., Inc.***, 922 S.W.2d 105, 107 (Tenn. 1996) (Holding of Court that plain language of T.C.A. § 22-3-105(b) allows for four additional peremptory challenges where there is more than one party plaintiff or party defendant).

Plaintiff's contends that this action involves three separate consortium claimants: Plaintiff, and her two sons, both minors at the time of their father's death. Based on this assertion, Plaintiff argues that they [she and her two sons] were entitled to use eight peremptory challenges pursuant to T.C.A. § 22-3-105(b).

In ***Jordan v. Three Rivers Hosp.***, 984 S.W.2d 593 (Tenn. 1999), our Supreme Court held that a court may consider spousal and parental consortium damages in wrongful death actions "when calculating the pecuniary value of a deceased's life," but stressed that "[t]his holding does not create a new cause of action but merely refines the term "pecuniary value."" ***Id***. at 601. Three years later, in ***Kline v. Eyrich***, 69 S.W.3d 197 (Tenn. 2002), the Court again explained the status of a wrongful death action:

> The parties do not dispute that the statutes permitting an action for the wrongful death of another create "no right of action exist[ing] independently of that which the deceased would have had, had [he or she] survived." ***See Rogers v. Donelson-Hermitage Chamber of Commerce***, 807 S.W.2d 242, 245 (Tenn. Ct. App. 1990); ***Memphis St. Ry. Co. v. Cooper***, 203 Tenn. 425, 431; 313 S.W.2d 444, 447 (1958). Although the living beneficiaries of the action may seek a limited recovery for their own losses in addition to those of the decedent, ***see Hill v. City of Germantown***, 31 S.W.3d 234, 239 (Tenn. 2000); ***Jordan v. Baptist Three Rivers Hosp.***, 984 S.W.2d 593, 598 (Tenn. 1999), the right of action itself remains one that is "single, entire[,] and indivisible." ***See Wheeler v. Burley***, No. 01A01-9701-CV-00006, 1997 WL 528801 (Tenn. Ct. App. filed at Nashville, Aug. 27, 1997), ***perm. to appeal denied***, Apr. 13, 1998. In point of fact, therefore, "[t]here can be but one cause of action for

the wrongful death of another." ***Matthews v. Mitchell***, 705 S.W.2d
657, 660 (Tenn. Ct. App. 1985).

*Id*. at 206-07.  Accordingly, we find that the sons' loss of consortium claims do not constitute new and separate causes of action.  Plaintiff, as Administratrix, is the sole party plaintiff and, as such, is entitled to only four peremptory challenges.

Having determined that the trial court erred in granting Plaintiff eight peremptory challenges, and thereafter permitting Plaintiff to exercise five such challenges, we must now examine whether the trial court's ruling constitutes reversible error requiring remand for a new trial.  T.R.A.P. 36(b) provides:

> **(b) Effect of Error.**  A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or ***would result in prejudice to the judicial process.*** [emphasis supplied].

In ***Tuggle v. Allright Parking Sys., Inc.***, 922 S.W.2d 105 (Tenn. 1996), our Supreme Court, faced with noncompliance with T.C.A. § 22-3-105, said:

> Having determined that the trial court erred, we must next consider whether the error requires remand for a new trial.  We have previously stated, in the criminal context, that "[t]he Legislature, in its wisdom, certainly has the right and power to direct the judicial process." ***State v. Cook***, 816 S.W.2d 322, 327 (Tenn. 1991).  We also have emphasized that, "[r]ules prescribing jury selection procedures are intended to protect the integrity of the jury system by providing a uniform and ordered method that ensures the accused a fair and impartial jury chosen from a fair cross-section of the community." ***State v. Coleman***, 865 S.W.2d 455, 458 (Tenn. 1993).  Although the stakes are different in civil cases, the power of the Legislature to direct the judicial process is unchanged, and the purpose of the procedural rules is the same – to insure uniformity, impartiality, and fairness in jury selection.  While it is difficult for an individual litigant to prove that a deviation from such procedural rules "more probably than not" affects the judgment in a particular case, ***it is clear that compliance with such rules protect the integrity of the jury system and safeguard the administration of justice***.  *Id*. Therefore, such deviations from prescribed procedural rules have been held to constitute prejudice to the judicial process under Tenn. R. App. P.  36(b).

In this case, [plaintiff] was denied the use of his statutorily mandated number of peremptory challenges. In our view, denial of that right, which was designed to safeguard the administration of justice, constitutes prejudice to the judicial process and requires a reversal in this case under Tenn. R. App. P. 36(b). As a result, we affirm the Court of Appeals' decision that a new trial must be granted.

*Id*. at 108 (citations omitted) (emphasis added).

While we recognize that Plaintiff's issue on appeal in *Tuggle* was premised upon the trial court's denial of entitlement to statutorily mandated peremptory challenges, we find the Supreme Court's ruling no less persuasive or applicable in the instant case. In *Tuggle*, the court interpreted the plain and mandatory language set forth in T.C.A. § 22-3-105(b) to require a grant of four additional challenges in circumstances involving more than one party plaintiff or defendant. *Id*. at 107. Although subsection (a) of this statute does not utilize the same mandatory language ("shall be allowed") as (b), we reiterate that the plain language of subsection (a) limits the number of permissible peremptory challenges for a single party plaintiff or defendant to four. The trial court's failure to comply with the procedural guidelines set forth in subsection (a), when applying the reasoning utilized by the Court in *Tuggle*, "constitutes prejudice to the judicial process" and therefore requires a reversal in this case under T.R.A.P. 36(b).

We briefly address Plaintiff's final assertion that defendants waived this allegation of error in failing to enter an oral or written objection to the court's ruling at trial. Defendants contend that their filing of Motion in Limine #13 on April 19, 2002, prior to commencement of trial, sufficiently apprised the court of defendants objection to allowing plaintiff more than four peremptory challenges. Defendants aver that "[t]here was no need for the Defendants to take exception to the ruling of the trial court," nor was action further required to "preserve this issue on appeal."

T.R.C.P. 46 states that "[f]ormal exceptions to rulings or orders of the court are unnecessary." This Court applied Rule 46 in the case of *Smith v. Williams*, 575 S.W.2d 503 (Tenn. Ct. App. 1978). In *Williams*, the parties entered an agreed order waiving a jury trial and agreeing that the lawsuit would be tried before the trial court without a jury. *Id*. at 504. The trial judge refused to sign the order and instead impaneled a jury to hear the issues. *Id*. On appeal, defendant raised as one of his issues and assignments of error the correctness of the trial court's decision to impanel a jury. In examining the issue, this Court noted:

The record does not reveal an objection or exception by the defendants to the ruling of the trial judge that the issues would be submitted to a jury. We hold, however, that under Rule 46, Tennessee Rules of Civil Procedure, an objection at that point was not necessary. At the time the motion was tendered and the action of the trial judge was sought, both parties made known to the judge the

-14-

action desired on the motion, namely, to waive the jury. The defendants made this ruling by the trial judge the basis of Ground VIII of their Motion for New Trial and Assignment of Error No. 1 before this Court. We, therefore, hold that the claimed error is properly before this Court for review.

*Id*. at 504.

We find Plaintiff's assertion without merit. The judgment of the trial court is reversed and the case is remanded for a new trial.

Since this case will be remanded for trial, we will discuss the pertinent remaining issues.

Upon our review of the issues and relevant case law in this matter, we find that defendants' second and fourth issues can be considered simultaneously.[5] Defendants' second issue raises the question of whether the "trial court erred in denying Defendants' pre-trial motion in limine #10 relating to the exclusion of learned treatise materials resulting in the improper admission and use of hearsay treatises and other "medical literature" by Plaintiff throughout the trial." Defendants' fourth issue asks this Court to review "[w]hether the court erred in allowing Dr. Witt to introduce the substance of unidentified "medical literature" and/or treatise materials into evidence in violation of the rule excluding hearsay."

Defendants' Motion in Limine #10 sought to exclude the introduction of learned treatise materials as substantive evidence, stating specifically:

> Properly authenticated reliable authority may be used to impeach an expert's credibility. It may not be admitted as substantive evidence. Tennessee Rule of Evidence 618. An expert may not, however, read from the medical literature to establish as substantive evidence the matters contained in the literature, nor may the expert read the literature, and then testify to what the literature states. Cary v. Aerosmith, 777 S.W.2d 8, 818 (Tenn. Ct. App. 1989).

> The defendant hereby moves this Honorable Court in limine to prevent improper use of medical literature beyond impeachment of a witness' credibility.

The parties have not pointed out, nor has the Court found in the record, an order of the court ruling on this motion. Therefore, the issue pertaining to this motion *in limine* will not be considered.

---

[5] Point of fact, we note that defendants' brief does not explicitly or solely examine the issue of whether the court erred in denying defendants' Motion in Limine #10, but rather appears to address both questions as part of a single issue.

During the course of trial, Plaintiff's expert, Dr. Witt, was recalled to rebut the testimony of defendant's expert, Dr. Eichhorn, with regard to testimony offered by defendants' expert on the carotid artery occlusion theory. Defendants specifically charge as error the trial court's decision to allow Dr. Witt to state that several of his opinions were "supported in the medical literature." We quote at length from Dr. Witt's testimony.

> Q. Were any of the anesthetic medications administered to Larry Hunter detrimental to autoregulation?
>
> A. Well, certainly the Desflurane modifies autoregulation, mostly at the upper levels, as I mentioned. But the significance of it is that it really takes the issue of autoregulation to a point where it's really not a very significant issue in this – in this case.
>
> Q. Why?
>
> A. Because at the concentrations used, Desflurane eliminates virtually all of the autoregulatory response.
>
> Q. And is that opinion supported in the medical literature?
>
> A. Yes.
>
> Q. Do you have literature to support that here with you today?
>
> A. Yes.
>
> Q. And, in substance, what does it say?
>
> MR. WARLICK: Objection, Your Honor. We're back to Rule 618 and he's not even crossing the witness.

The court instructed the lawyers to approach and a bench conference ensued. Defense counsel objected to Dr. Witt testifying about or directly stating the substance of the medical literature relied upon for his opinion. Plaintiff's counsel asserted that he was relying upon Tenn. R. Evid. 703 for admission of the expert's opinion and statements. The court concluded that it would allow Plaintiff's counsel to complete direct examination and would permit the witness to "state how [the literature] support[s] his theory." When questioning resumed, counsel inquired:

> Q. (By Mr. Smith) Dr. Witt, is the literature that you referenced on this issue, that you have here today, consistent with the testimony you've given on this issue?

A. Yes.

Q. Now, I want to ask you about something else that Dr. Ura testified about, and that was that hyperventilation and some of these anesthetic medications that he gave, will lower the intracranial pressure. I want you to assume that he testified to that.

Do you agree or disagree with that?

A. Disagree with that.

Q. Why?

A. Hyperventilation will lower intracranial pressure that is already pathologically elevated. It will not lower a baseline intracranial pressure, except insofar as it produces vasoconstriction of the blood vessels in the brain. And it's possible to actually produce ischemia in the brain – inadequate blood flow to the brain – by hyperventilation alone, as well as several other deleterious effects.

Q. Do you have literature here with you today that supports that opinion?

A. Yes.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. I want you to assume that Dr. Eichhorn characterized your testimony on the range of the central venous pressure of between 10 and 18 as ridiculous.

Do you agree or disagree with that comment?

A. I disagree.

Q. Why?

A. There is abundant evidence that positive pressure ventilation impedes return of venous blood to the chest. That is, the major impact of positive pressure ventilation is to increase central venous pressure.

Now, whether – I didn't hear his testimony. Where there may have been a misunderstanding is that what I said – and I think I was

-17-

clear – is that the CVP will not affect intracranial pressure unless or until it goes above the level of intracranial pressure.

So, in other words, on a ventilator, I calculated that the CVP was probably somewhere between 10 and 18. And I believe I testified to that earlier. I have no way of knowing what it was, because it wasn't measured.

But what my point was, that the intracranial pressure could be increased by placing this patient on a ventilator, it would not be decreased, and in no case, would it be less than 10. I chose to use the more conservative number of 10 in my calculations of cerebral perfusion pressure.

Q. And is the statement that you just made supported in the literature?

A. Yes.

Q. Do you have that literature with you here today?

A. Yes.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. At what level of administration of Desflurane does autoregulation get perked?

A. You start seeing an impact – at least supported in the literature, it's probably a continuum – but at least supported in the literature, somewhere around 3 percent, and by the time you get up to 9 percent, it's completely eliminated.

Q. And how much was administered for most of this case?

A. The range was from 3 to 8.

Q. And is that statement that you just made supported in the literature that you have here with you today?

A. Yes.

Defendants did not enter an oral objection to Dr. Witt's above-cited testimony during the course of direct examination; however, at the conclusion of the proof in this trial, defense counsel made a

motion to strike "any testimony that [Dr. Witt] says was supported by the literature." Said motion was denied by the court.

The trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995).

Tenn. R. Evid. 618 states:

> **RULE 618. IMPEACHMENT OF EXPERT BY LEARNED TREATISES**
>
> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice, may be used to impeach the expert witness's credibility but may not be received as substantive evidence.

It appears to the Court that the questions and answers complained about are somewhat analogous to Dr. Witt testifying that as a basis for his opinion he relied, among other things, on medical literature, such as published articles and treatises. However, as noted above, no objection was made to the questions propounded to Dr. Witt and it was only after renewing motions for directed verdict in the case that defendant moved to strike this part of Dr. Witt's testimony. Tenn. R. Evid. 103 states in pertinent part:

> (a) Effect of Erroneous Ruling. - Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> (1) *Objection*. - In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context; . . .

We do not believe that making a motion, after renewing motions for directed verdict, is a timely motion to strike the alleged erroneous evidence.

Defendants' issues three and ten deal with the qualifications of plaintiff's witness, Dr. William O. Witt, as an expert witness. Because this question will necessarily be determined in the trial on remand, we pretermit defendants' issues three and ten.

Defendants' next three issues stem from plaintiff-counsel's cross-examination of defense expert Dr. Eichhorn.

Defendants' first related issue asks this Court to consider whether the trial court erred in permitting Plaintiff's counsel "to conduct a cross-examination of [Dr. Eichhorn] with statements contained in published treatises or periodicals which were never identified or established as reliable authority by any witness contrary to [Tenn. R. Evid. 618]."

"The propriety, scope, manner and control of the cross-examination of witnesses" rests within the discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); *Davis v. State*, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948)). Exercise of this discretion will generally not be disturbed absent a finding of abuse. *State v. Bragen*, 920 S.W.2d 227, 244 (Tenn. Crim. App. 1995) (citing *State v. Lewis*, 803 S.W.2d 260, 262 (Tenn. Crim. App. 1990)).

Tenn. R. Evid. 618 indicates that a published treatise or medical journal/periodical must be "established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice," where said treatise or journal/periodical is relied upon to impeach an expert witness's credibility during cross examination. Stated more completely:

> "[T]he propriety, scope, manner and control of the cross-examination of witnesses ... rests within the sound discretion of the trial court." *State v. Korsakov*, 34 S.W.3d 534, 545 (Tenn. Crim. App. 2000); *see also State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Once again, however, the trial court's exercise of discretion is circumscribed by the Tennessee Rules of Evidence. As relevant to the current discussion, Tenn. R. Evid. 618 permits the use of "learned treatises," i.e., "statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art," to impeach an expert witness' credibility provided the following prerequisites are satisfied: (1) The treatise was called to the attention of the expert witness upon cross-examination or relied upon by the witness in direct examination; and (2) The treatise has been established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice. We note that the adoption of this rule in 1990 was merely a restatement of current Tennessee law, which provided:

>> "An expert witness may be cross-examined by the use of standard authorities on the subject.... "When a witness is testifying as an expert, it is competent to test his knowledge and accuracy upon cross-examination by reading to him, or having him

read, extracts from standard authorities upon the
subject-matter involved, and then asking him
whether he agreed or disagreed with the authorities,
and comparing his opinion with those of the
writer.""""

*State v. Coulter*, 67 S.W.3d 3, 64 (Tenn. Crim. App. 2001) (citing *Nix v. State*, 530 S.W.2d 524, 531 (Tenn. Crim. App. 1975) (quoting *McCay v. Mitchell*, 62 Tenn. App. 424, 463 S.W.2d 710, 720 (1970))) (citations omitted).

Defendants take issue with several questions asked by Plaintiff's counsel of Dr. Eichhorn on cross-examination, contending that these questions were based upon or taken directly from "published treatises or periodicals which were never identified or established as reliable authority by any witness contrary to [Tenn. R. Evid. 618]." We quote from the trial transcripts the specific questions challenged, and briefly reference the pertinent procedural facts:

Q. Let me see if you agree with this concept: Hypotension
from any cause may produce cerebral or spinal cord ischemia.
Hypotension may be associated with positioning and is usually
caused by venous pooling; that is, the sitting position, or decreased
venous return, as in a prone position with increased intra-
abdominal pressure.

And that second part we did not have in that case, did we?

A. Correct.

Q. When the head and spinal cord are elevated above the
level of the heart –

Defense counsel interjected and requested that counsel be permitted to approach the bench. During the ensuing bench conference, defense counsel remarked that Plaintiff's counsel's questioning "sounds like cross-examination from a reliable authority that has not been identified yet." Defendants' co-counsel further stated that Plaintiff's counsel was reading as if from a book, therefore requiring counsel to identify the quoted or referenced authority. We note that defense counsel did not explicitly state an objection to counsel's question. With the court's permission, Plaintiff's counsel proceeded with the following line of questioning:

Q. (By Mr. Smith) Let me start over, Dr. Eichhorn.

Hypotension from any cause may produce cerebral or spinal
cord ischemia....

*************************************************

-21-

Q. Hypotension may be associated with positioning and is usually caused by venous pooling, e.g., in the sitting position.

When the head and spinal cord are elevated above the level of the heart, blood pressure should be referenced to head level to ensure that monitored pressure reflects perfusion pressure.

Do you agree or disagree with that?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Are you familiar with the *Manual of Complications in Anesthesia*?

A. There are two or three of them, which one?

Q. How about Michael Mahla?

A. Say that again.

Q. Mahla. M-A-H-L-A?

A. I don't believe I have that book.

Q. You've got those in your library, don't you?

A. It's possible, I don't know.

Q. Do you consider those to be reliable texts, *Complications in Anesthesia*?

A. I understand the nature of your question. I don't choose to characterize any textbook or publication as authoritative or reliable, because, frankly, they're just words.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Fair enough. Let me see if you would agree or disagree with this.

Defense counsel asked for a bench conference and "renewed" his previous objection to the questions as based upon a learned treatise that had not been established as a reliable authority. The trial court permitted Plaintiff's counsel to proceed despite defendants' objection, and counsel resumed questioning:

-22-

Q. (By Mr. Smith) Let me see if you agree with this.

For patients in a head-elevated position, the appropriate zero reference for blood pressure is the brain at the external auditory meatus, not the heart. Failure to use the brain as the zero reference, after sitting a patient up, will lead to an overestimation of cerebral perfusion pressure.

Do you agree or disagree with that?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Well, I'm going to stick right now with the word "inadvertent," but I certainly have no problem with you using "accidental." In fact, I'll use it, okay?

Accidental hypotension is quite probably the most frequent complication of the sitting position. Its presence requires rapid detection and prompt treatment if significant cerebral hypoxia is to be avoided. Agree or disagree?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. And you would agree with me that you have read in the literature many, many times that the warnings are out there that, indeed, would say, just because you get below the level of autoregulation doesn't mean that you're going to lose blood flow to the brain and have hypoxia, because some people will be able to tolerate it, but others won't, and you need to get the pressure back up.

That's just all over the medical literature, isn't it, Doctor?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Let['s] see if you agree with this statement.

MR. REYNOLDS DAVIES: Your Honor, I renew my objection.

THE COURT: Okay.

MR. SMITH: May I proceed, Your Honor?

THE COURT: Yes.

Q. (By Mr. Smith) Although difficult to determine precisely, it has previously been estimated that at least 2,000 preventable instances of anesthesia-related death or permanent brain damage occur in the United States each year. Agree or disagree?

Other than the two objections cited, no additional objections were entered by defense counsel into the record. However, we note that where counsel interposes timely objections to a line of testimony, counsel is not required to repeat his objection in every instance where such testimony was elicited from the witness. *Gulf Refining Co. v. Frazier*, 19 Tenn. App. 76, 83 S.W.2d 285, 299 (Tenn. Ct. App. 1934). "One ruling on one question is enough, and a repetition of similar exceptions is not to be required, if, indeed, to be tolerated." *Id*. (quoting *Louisville & N. Railroad Co. v. Gower*, 85 Tenn. 465, 471, 3 S. W. 824, 826; *McCormick v. State*, 135 Tenn. 218, 230, 186 S. W. 95, L. R. A. 1916F, 382).

From our reading of the trial transcripts, it is apparent that counsel's cross-examination was framed by medical literature; literature that counsel failed to identify or establish as reliable authority. In *McCay v. Mitchell*, 463 S.W.2d 710 (Tenn. Ct. App. 1970), this Court stated:

> It is established in Tennessee [that] an expert witness may be cross-examined by the use of standard authorities on the subject. The *Court in Sale v. Eichberg* (1900) 105 Tenn. 333, 59 S.W.1020, cited *Byers v. Nashville, C. & St. L. Railroad Co.*, 94 Tenn. 345, 29 S.W. 128, which states: "When a witness is testifying as an expert, it is competent to test his knowledge and accuracy upon cross-examination by reading to him, or having him read, extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with those of the writer."

*Id*. at 720.

In this case, it appears as though Plaintiff's counsel was permitted to circumvent the requirement of establishing and identifying the literary authority upon which he was relying to frame his cross-examination questions[6] by simply presenting his inquiries as general questions

---

[6] During a bench conference, the trial court appeared to acknowledge that counsel was required to identify a relied upon authoritative text, stating:

THE COURT: You just can't say, "It's an authoritative text, let me show you the

(continued...)

seeking agreement or disagreement with a noted theory or statement of facts. The format utilized by counsel in questioning Dr. Eichhorn closely mirrors the generally accepted method of first reading excerpts from a standard authority to the expert, and then asking whether he agrees or disagrees with the stated authority. *See id*. However, in questioning an expert witness with regard to statements or excerpts from a standard authority, counsel must first establish the authoritative character of the book or treatise offered for the purpose of cross-examination. *See id*. In the instant case, counsel failed to identify the authority or authorities upon which he was basing his questions, and therefore failed to establish the authoritative nature of these texts. As such, the trial court erred in permitting counsel to question Dr. Eichhorn with regard to theories or statements plucked from or based upon unidentified treatises or books.

Moreover, from our review of the record and trial transcripts in this case, we find no evidence to indicate that Michael Mahla's *Manual of Complications in Anesthesia* was ever established as a reliable authority. We note that Dr. Eichhorn refused to acknowledge this text as standard authority, and therefore the burden was on Plaintiff to introduce proof of the authoritative nature of the text by independent evidence:

> [W]here the expert being cross-examined does not or will not acknowledge the medical authority presented, the authoritative character of the book or treatise offered for the purpose of cross-examination must be proven by independent evidence. *Stallings v. State* (1953) 232 Ind. 646, 114 N.E.2d 771; *Smarr v. State* (1953) 260 Ala. 30, 68 So.2d 6. Demanding proof as to the authoritative nature of the medical work offered has the wholesome effect of not permitting this issue to be determined by mere statement of counsel. *Laird v. Boston & M.R. Co.* (1922) 80 N.H. 377, 117 A. 591.

*McCay*, 62 Tenn. App. 424, 463 S.W.2d at 720.

While counsel did not explicitly ask the witness to agree or disagree with a statement from this particular treatise, it is evident that the questions immediately following counsel's inquiry into the expert's familiarity with this text were premised upon Mr. Mahla's work. Under the circumstances of this particular case, we find no reason for counsel to question Dr. Eichhorn as to his familiarity with this text other than to determine whether the expert agreed or disagreed with specific statements or excerpts from the text. Therefore, any question premised upon Mr. Mahla's *Manual of Complications in Anesthesia* was improper, where said treatise or text was not established as reliable authority.

---

[6](...continued)
    text." As far as we're concerned, this is anesthesia by [Wife's counsel].

In conclusion, we find that the trial court erred in permitting Plaintiff's counsel to ask Dr. Eichhorn to agree or disagree with statements or excerpts from unidentified authorities. Further, we find that the trial court erred in permitting counsel to ask questions premised upon Mr. Mahla's *Manual of Complications in Anesthesia*, where plaintiff failed to establish this text as reliable authority.

Defendants next present for review the issue of whether the trial court erred in allowing Plaintiff's counsel "to conduct a cross-examination of Dr. Eichhorn by challenging the witness on various occasions to "cite me to one piece of medical literature" supporting his testimony contrary to the provisions of [Tenn. R. Evid. 618 and Tenn. R. Evid. 705.]"

In their brief to this Court, defendants identify three specific instances in which Plaintiff's counsel asked Dr. Eichhorn to "cite me to one piece of medical literature" supporting the expert's testimony. Counsel is entitled to cross examine to determine the basis of an expert's opinion. Although the questions as posed take an adversarial attitude, as cross examination generally does, counsel's questions were seeking to elicit a basis for the opinion. Nevertheless, from our reading of the trial transcript, we find that defense counsel did not enter a timely objection after any of the allegedly improper questions. A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal. *See* Tenn. R. App. P. 36(a), cmt. a.

The final issue related to Plaintiff's counsel's cross-examination of Dr. Eichhorn asks this Court to consider the following question, as stated in defendants' brief:

> Whether the trial court abused its discretion in denying Defendants' motion for mistrial after Plaintiff's counsel conducted an improper cross-examination of Dr. Eichhorn concerning a specific instance of prior conduct; namely, a statement allegedly attributed to the witness that he compared his role as a defense expert to that of a "prostitute," when there was no reasonable factual basis for such questioning and where Plaintiff failed to request a jury-out hearing before questioning the witness as required by [Tenn. R. Evid.] 608(b)(1)."

During his cross-examination of Dr. Eichhorn, Plaintiff's counsel questioned the witness regarding his role as an expert testifying for the defense in a medical malpractice action. We quote at length from the trial transcript:

> Q. Well, we're going to – as I said, we're going to discuss that a little bit more later.
>
>   But I want to talk, for a moment, about your roles – what you perceived your role to be in a case like this where you're

coming into a court to offer expert opinions. First question about that.

Do you perceive it as your role in participating in a case for the defense, with issues like this, that it is incumbent upon you to create a theory of defense?

A. No.

Q. That would be inappropriate, wouldn't it?

A. And potentially not possible.

Q. Do you consider it your role to be an advocate for the party for whom you're testifying?

A. No.

Q. That would be inappropriate, wouldn't it?

A. Correct.

**********************************************

Q. Now, let me take it like this, and make it a little bit more specific. You've testified in a case before where you were the expert witness for an anesthesiologist in a case where the blood pressure got too low and the patient's brain died, haven't you?

A. I don't recall specifically, but it's certainly possible.

Q. Well, we're going to – let me see if I can help you.

Have you ever before, Dr. Eichhorn, in serving in this type of role, when serving as an expert witness for an anesthesiologist, sued because a patient came out of a surgery procedure brain dead, because of low blood pressure, said to the defense lawyer who hired you, "There are big problems with what your anesthesiologist did, but I will help you create a theory to defend this case, and short of hiring an outright prostitute, I'm the best you're going to find?" Have you ever said that?

MR. REYNOLDS DAVIES: Your Honor, may we approach the bench.

-27-

Before the court had an opportunity to grant defense counsel's request, Dr. Eichhorn denied that he had ever made this statement. During the ensuing bench conference, defense counsel objected to the alleged statement as hearsay within hearsay. The trial court ordered the jury out, and asked counsel to provide a background for the alleged statement. After Plaintiff's counsel provided the necessary background, defense counsel restated his objection:

> MR. REYNOLDS DAVIES: What we have is a letter that was written by this lawyer who was indicted where – wherein he quotes a quotation that's attributable to Dr. Eichhorn, which Dr. Eichhorn just denies.
>
> THE COURT: Okay. Take me through this again. Because I asked him if whatever Dr. Eichhorn said was in a piece of paper.
>
> MR. REYNOLDS DAVIES: No. Dr. Eichhorn never said anything in a piece of paper. The lawyer – a lawyer – said something in a letter to his insurance carrier –
>
> THE COURT: I see.
>
> MR. REYNOLDS DAVIES: – attributing a quote to Dr. Eichhorn that Dr. Eichhorn denies he ever made.

In response to defendants' objection, Plaintiff's counsel explained that the intended purpose of the question was to "impeach this witness on his bias" through use of a prior inconsistent statement pursuant to Tenn. R. Evid. 613. Defense counsel thereafter raised additional objections under Tenn. R. Evid. 403 and Tenn. R. Evid. 609. Defense counsel additionally asked that a curative instruction be given to the jury or, if no such instruction was to be given, moved for a mistrial.

After consideration of the parties' arguments on this issue, the trial court determined that Tenn. R. Evid. 616 was not applicable, and further concluded that the alleged statement was not a prior inconsistent statement of the witness, but rather a "lawyer's characterization of what Dr. Eichhorn said." The court reasoned that the letter provided a reasonable factual basis for counsel's inquiry, but determined that the prejudice of allowing counsel to question Dr. Eichhorn as to this statement substantially outweighed its probative value. On this basis, the court decided to "leave out" the statement. Defense counsel elected to forego a curative jury instruction. The court did not rule on defendants' motion for mistrial.

A hearing on the parties' post-trial motions was held on August 13, 2002. During this hearing, defendants addressed the prejudicial effect of counsel's cross-examination question as grounds for their motion for mistrial. We quote at length the discourse between defense counsel and the court on this issue:

-28-

MR. REYNOLDS DAVIES: I think, since that was our only expert witness, coupled with the fact that Dr. Hays could not be available, at no fault of the defendants, to ask Dr. Eichhorn that question, knowing that there was no way to prove it or nothing to back it up, without asking for a jury-out hearing, was wrong.

You did suggest that you would give the jury an instruction to ignore it. However, you didn't exactly – you stated you didn't exactly know what you were going to say.

Because it happened before lunch and we took a long lunch break. We moved for a curative instruction, or in the alternative for a mistrial. We felt like the curative instruction really couldn't cure that error, and that we accepted – we went on with the trial without getting the instruction.

But we did move for a mistrial.

THE COURT: Uh-huh. You certainly did.

MR. REYNOLDS DAVIES: And I don't think we were required to take a curative instruction, because I think under those circumstances, asking a doctor if he's ever said that, "Short of an outright prostitute, I'm the best you're ever going to get," I don't know how you could have unrung that bell. So –

THE COURT: Well, it – I think you were right. I probably encouraged you not to have a curative instruction, because it was – it was so out of the line of questioning that – and we took a lunch break after that, that it's often been my theory about not emphasizing, it doesn't bring it back to the jury's mind about, "What in the world is that about," okay? Because the subject matter of that letter would have been much – would have been potentially much more familiar to us in the legal world than it would have been to the jurors.

But you can't – you couldn't really unring the bell, that's true. But we did not – and we did not look at any specific wording, because I usually leave that up to the folks, if, you know, somebody talks about insurance, if, you know, they just wanted the curative instruction from the jury instructions, or if they want something else, or if they want nothing.

I don't think that dilutes your motion for a mistrial.

-29-

Okay. Let's go to the next issue.

MR. REYNOLDS DAVIES: Did – have you – have you overruled that ground, Your Honor? I'm a little confused as to the ruling. The ruling about the – I understand about Dr. –

THE COURT: I don't believe that there – I'm not even ruling on whether the question should have been asked. I never had to make a ruling on that. I went right to the hearing part. And it's not clear in the rule whether the hearing has to be done. Obviously, I was very – I was not happy about the question. I think I made that very clear to the plaintiffs.

MR. REYNOLDS DAVIES: Well, I just – I mean, just for the purposes of the record –

THE COURT: I still say that no mistrial should be granted. So, yes, I overrule it.

Plaintiff contends that counsel's question was proper pursuant to Tenn. R. Evid. 613 for the purpose of impeaching Dr. Eichhorn with a prior inconsistent statement that demonstrated bias on behalf of the witness. We find Plaintiff's assertion without merit, and note that there is no evidence to indicate that Dr. Eichhorn ever made the statement attributed to him. The expert denied making the statement, and Plaintiff's only basis for asking the question is a letter, entered as an exhibit at trial, written by an individual unavailable for cross-examination, alleging that Dr. Eichhorn made such a statement. For these reasons, we find that there was no reasonable factual basis for counsel to pursue this line of inquiry. At the very least, it appears that the prejudicial effect of the question, when asked of Defendants' sole expert witness in the presence of the jury, far outweighs its probative value. In view of Dr. Eichhorn's importance to Defendants' case, the error more probably than not affected the jury's decision and is ground for reversal.

Defendants' next issue, as quoted from their brief, states:

Whether the trial court abused its discretion in denying Defendants' motions for mistrial or to continue the trial after Defendants were notified at the end of the first week of trial that a planned expert witness, Dr. Michael Hays, a local anesthesiologist in private practice in Nashville, was unavailable to testify due to the fact that he had been diagnosed with malignant lymphoma during the trial and planned to undergo immediate diagnostic tests and chemotherapy treatment.

We pretermit defendants' issue on the basis of our decision to remand this matter for a new trial.

Defendants' next issue asks this Court to consider the following:

> Whether the trial court erred in granting Plaintiff's pre-trial motion in limine relating to Dr. Hays' anticipated expert testimony about causation of injury and the carotid artery occlusion theory?

The trial court is afforded discretion to determine the "admissibility, qualifications, relevancy and competency of expert testimony." **McDaniel v. CSX Transp., Inc.**, 955 S.W.2d 257, 263 (Tenn. 1997). The trial court's rulings in this regard will be upheld except upon a showing of an abuse of this discretion. **See id**. at 263-64.

To reiterate, Plaintiff filed a pre-trial motion in limine seeking to preclude defendants "from offering expert testimony as to the causation or "possible" causation of the injuries or death of Plaintiff's decedent from occlusion of the carotid artery(ies)...." In ruling upon Plaintiff's motion, the court considered the deposition testimony of Dr. Hays, Dr. Eichhorn, and Dr. Wright. With regard to Dr. Hays's carotid artery occlusion theory testimony, the court determined that the "overwhelming weight of his testimony indicates that he believes this theory is only a possibility. This is not sufficient for an admissible expert opinion." The court thereby granted Plaintiff's motion with respect to Dr. Hays's carotid artery occlusion theory testimony.

Throughout the course of his deposition testimony, Dr. Hays was questioned extensively with regard to the issue of causation, and specifically the aforementioned carotid artery occlusion theory. The carotid artery theory testified to by Dr. Hays is a theory of causation as an alternative theory of causation than that presented by Plaintiff. In presenting this causation theory, Dr. Hays testifies in terms of possibilities and assumptions, and at one point stated that that he did not think "anybody is going to be able to know exactly what happened to Mr. Hunter." Dr. Hays stated that the impeding of the left and/or right carotid arteries, and/or the impeding of the vertebrals were possible explanations for the complications experienced and concluded that a combination of all of these factors provides a possible explanation for Mr. Hunter's death. Dr. Hays was testifying with regard to possible alternative causes and did not attempt to make a definitive determination to express an opinion as to the cause of Mr. Hunter's death. In **Mitchell v. Ensor**, No. W2001-01-683-COA-R3-CV, 2002 WL 31730908 (Tenn. Ct. App. November 18, 2002), a medical malpractice action filed by a female plaintiff alleging drastic physical changes caused by an injection of a male hormone drug, this Court was faced with a similar issue as the case at bar. This Court determined that the trial court did not abuse its discretion in permitting a defendant's expert to testify as to alternate causes of the plaintiffs's medical condition. Plaintiffs had objected to the expert's testimony as speculative, noting that he admitted that he "did not have an opinion as to the actual cause of the [patient's] condition." **Id**. at *13. This Court agreed with the trial court's decision that the expert's testimony was "rendered for the sake of bringing light to other potential explanations for [the patient's] condition, but not to prove ultimate causation." **Id.** at *14. We noted that the expert did not express an opinion concerning causation of the plaintiff's condition but merely addressed possible alternate causes for the condition. In

support of our conclusion, we relied upon *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210 (Ky. Ct. App. 2001) where the Court said:

> We conclude that defendants in medical malpractice actions may introduce expert witness testimony to rebut a plaintiff's expert witness testimony couched in terms of "reasonable medical probability," even though the defendant's expert witness's testimony is couched only in terms of "possibility." In so deciding, we are persuaded by the reasoning of the United States Court of Appeals for the First Circuit in the case of *Wilder v. Eberhart*, 977 F.2d 673 (1st Cir. 1992) cert. denied 508 U.S. 930-113 S.Ct. 2396, 124 L. Ed. 2d 297 (1993).

> In *Wilder*, a plaintiff patient filed suit against her defendant doctor and clinic for medical malpractice, alleging the doctor's surgical procedure caused her to suffer an esophageal injury. At trial, the plaintiff's expert witness testified that her injury was caused by the defendants' medical negligence. Expert medical testimony on behalf of the defendants, however, was ruled inadmissible by the trial court because it could not be expressed in terms of "probability" as distinguished from "medical possibility." In holding the trial court erred in excluding this testimony, the First Circuit reasoned as follows:

>> Proximate causation between negligence and the injury complained of in a medical malpractice case must be established by expert testimony. (Citation omitted). On the other hand, the defendant need not disprove causation. Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence. (Citation omitted). As the New Hampshire Supreme Court recently stated in *Tzimas* [*v. Coiffures by Michael*, 135 N.H. 498, 606 A.2d 1082, 1084 (N.H. 1992)], the plaintiff in a negligence action bears the burden of producing evidence "to prove that it is more likely than not that [plaintiff's] injury was "caused by the defendant's negligence." (Citation omitted). Defendant need not prove another cause, he only has to convince the trier of fact that the alleged negligence was not the legal cause of injury. (Citation omitted). In proving such a case, a defendant may produce other "possible" causes of the plaintiff's injury. These other possible causes

need not be proved with certainty or more probably than not. To fashion such a rule would unduly tie a defendant's hands in rebutting a plaintiff's case, where as here, plaintiff's expert testifies that no other cause could have caused plaintiff's injury. The burden would then shift and defendant would then bear the burden of positively proving that another specific cause, not the negligence established by plaintiff's expert, caused the injury. Certainly, this is much more than what should be required of a defendant in rebutting a plaintiff's evidence.

Were we to accept plaintiff's argument that once a plaintiff puts on a prima facie case, a defendant cannot rebut it without proving another cause, the resulting inequities would abound. For example if ninety-nine out of one hundred medical experts agreed that there were four equally possible causes of a certain injury, A, B, C and D, and plaintiff produces the one expert who conclusively states that A was the certain cause of injury, defendant would be precluded from presenting the testimony of any of the other ninety-nine experts, unless they would testify that B, C, or D was the cause of the injury. Even if all of defendant's experts were prepared to testify that any of the possible causes A, B, C or D, could have equally caused plaintiff's injury, so long as none would be prepared to state that one particular cause, other than that professed by plaintiff more probably than not caused plaintiff's injury, then defendant's experts would not be able to testify at all as to causation.

*Wilder*, 977 F.2d at 676-677 n.5. We agree with the First Circuit that expert testimony of this nature is admissible on behalf of defendants in medical malpractice cases in order to rebut the testimony of plaintiffs upon whom the burden of proof rests.

*Mitchell*, 2002 WL 31730908 at *16-17 (quoting *Sakler*, 50 S.W.3d at 213-14).

Finding the opinion in *Wilder* well reasoned, this Court adopted the holding expressed in *Wilder* and *Sakler* as dispositive of the issue presented. *Id*. at *17.

After examining Dr. Hays's deposition testimony, and in light of our decision in **Mitchell**, we find that the trial court erred in granting Plaintiff's pre-trial motion in limine precluding Dr. Hays from testifying about possible alternative causes of Mr. Hunter's death. Dr. Hays was testifying with regard to a possible alternate cause, rather than identifying a definitive cause for Mr. Hunter's death.

Defendants next present for review several issues relating to opposing counsel's closing argument to the jury. In general, the control over the argument of counsel resides with the trial court, and the trial court has broad discretion as to what shall and shall not be permitted in argument. **McCollum v. Huffstutter**, No. M2002-00051-COA-R3-CV, 2002 WL 31247077, at *9 (Tenn. Ct. App. Oct. 8, 2002). The appellate courts generally will not interfere with the discretionary action of a trial court in refusing to grant a mistrial or a new trial for misconduct of counsel in argument unless the argument is clearly unwarranted and made purely for the purpose of appealing to passion, prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel. **Perkins v. Sadler**, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991).

These issues involve the repeated reference in Plaintiff's closing argument to Dr. Witt's testimony being supported by the medical literature. Although three of the issues are waived for failure to make a contemporaneous objection, **see State v. Little**, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992), on retrial the Court should consider our earlier finding that it was error to permit counsel to make references to unidentified medical literature in the examination of witnesses. In the fourth related issue concerning argument of counsel, contemporaneous objection was made and overruled by the trial court.

Defendants next issue, as stated in their brief:

> Whether the court's retrospective application of the Jordan decision allowing the jury to award loss of consortium damages in this case is unconstitutional as it violates Defendants' rights under Art. I, § 20 of the Tennessee Constitution, and vested rights protected by the Due Process and Equal Protection Clauses of the 14th Amendment to the Constitution of the United States.

The cause of action in this matter arose on or about November 1, 1995. On October 28, 1998, Plaintiff filed a Motion for Leave to Amend Complaint adding, in part, loss of consortium "claims" on her own behalf and that of her two sons. Defendants did not object to the inclusion of the loss of consortium claims. On July 23, 2001, Plaintiff filed an Amended Complaint seeking damages on the basis of the aforementioned claims. Trial in this matter began on April 22, 2002, and a jury verdict returned on May 2, 2002.

In *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 600-02 (Tenn. 1999), the Tennessee Supreme Court held, *inter alia*, that loss of consortium damages are recoverable by a decedent's family as part of the pecuniary value of the deceased's life.[7] The following year, in *Hill v. City of Germantown*, 31 S.W.3d 234 (Tenn. 2000), the Court considered, *inter alia*, the specific issue of "whether [*Jordan*] applies retroactively to this case to permit loss of consortium damages to be awarded to the plaintiffs." *Id*. at 235.

In *Hill*, plaintiff-family members filed separate wrongful death actions against the City of Germantown and a police officer for deaths resulting from a high-speed chase. *Id*. at 236. The trial court, sitting without a jury, entered judgment for plaintiffs. *Id*. The court applied the statutory damages cap imposed by the Tennessee Governmental Tort Liability Act ("GTLA"), and "awarded $130,000.00 for each of the wrongful death claims, the maximum amount of recovery permitted under the GTLA." *Id*.

Plaintiffs appealed, and the Tennessee Court of Appeals affirmed the trial court's decision in all respects. *Id*. The Supreme Court granted review, holding, in part:

> We hold that *Jordan* applies retrospectively to: (1) all cases tried
> or retried after [January 25, 1999,] the date of our decision in
> *Jordan*; and (2) to all cases pending on appeal in which the issue
> decided in *Jordan* was raised at an appropriate time.

*Id*. at 240.[8]

Applying the holding in *Hill*, we find that the trial court did not err in allowing retroactive application of the *Jordan* decision to the case at bar. Trial in this matter began on April 22, 2002. Plaintiff properly and timely amended her complaint to include a claim for loss of consortium damages, and defendants entered no objection to said amendment. We therefore find defendants' issue without merit.

Defendants next issue asks us to consider the following question:

> Whether the court violated Defendants' guaranty to trial by jury
> under the Tennessee Constitution by commenting upon the
> evidence during the jury charge that this case was "a very

---

[7] The Court's holding reversed *Davidson Benedict v. Severson*, 109 Tenn. 572, 72 S.W. 967 (Tenn. 1902), "to the extent that *Davidson Benedict* prohibits consideration of spousal consortium losses when calculating the pecuniary value of a deceased's life under the wrongful death statute." *Id*. at 600.

[8] Although the court determined that the issue of loss of consortium damages was properly before it, the court concluded that the retroactive application of *Jordan* to allow recovery for loss of consortium damages would not increase the plaintiff's damages because both plaintiffs "received $130,000, the maximum allowable under the GTLA per injured person." *Id*. (citation omitted).

interesting and difficult case," and that the jury would find Question #1 on the verdict form (were the Defendants at fault?) to be a "deceptively simple question" and one to which there was "obviously not a simple answer."

During the course of jury instructions, the trial judge made several comments to which defendants now object and specifically challenge as improper and in violation of the Tennessee Constitution's guaranty to trial by jury. We quote at length from the trial transcript so as to present the court's comments in their proper context:

> And I do want to say that, even though it was a very long two weeks, you were – if you were going to have sat through a two-week trial, this was certainly one of the better presented trials that I have seen from both sides. And you can see that – just two of our many boxes down there – you can see that this was a very interesting and difficult case and why you are now in the position of having to make a decision in this case.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Now, now we're getting into trying to define a little bit more concisely what the answer to Question Number 1 is on your verdict form. I think you can even remember that.
>
> "Is Dr. Ura or Nashville Anesthesia Services at fault?" Okay. Simple question. Obviously not a simple answer. Okay.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> So all of the instructions – not the general ones, but all the ones about fault – all are contained in you consideration of Question Number 1, which is a deceptively simple question, okay? "Yes or No." No explanations. You just get "Yes or No."
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> So I simply encourage those of you who are very strong in your opinions to perhaps sit back, okay? Those of you who are a little less used to expressing your opinion right at the beginning, this is an opportunity for you to really be a part of this whole group, okay?
>
> We choose 13 persons for a reason. Okay? If we were only going to have one person making the decision, obviously that's

what I get paid to do, in other kinds of case[s], okay? So we want to make sure that we're getting the full measure of this entire jury to make this difficult decision.

Okay. So you need to listen to each other, and you need to discuss with each other, and you need to be respectful of each other. And I know that you will do that, because you just seem like the kind of jury that will be doing that, okay?

Our law is clear that a trial judge shall avoid expressing his or her opinions to a jury in any manner concerning matters to be passed upon by the jury. *Pridemark Custom Plating, Inc. v. Upjohn Co., Inc.*, 702 S.W.2d 566, 577 (Tenn. Ct. App. 1985) (citing *McCay v. Mitchell*, 62 Tenn. App. 424, 463 S.W.2d 710 (1970). "[Judges] must refrain from making statements that might reflect on the weight of the evidence or the credibility of the witnesses or that might otherwise influence the jury concerning the facts." *Mercer v. Vanderbilt Univ., Inc.*, No. M2000-00801-COA-R3-CV, 2002 WL 31728864, at *4 (Tenn. Ct. App. Dec. 5, 2002) (citing *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989); *McBride v. Allen*, 720 S.W.2d 459, 462-63 (Tenn. Ct. App. 1979)).

From our reading of the trial judge's comments to the jury, we are unable to conclude that the judge's statements constituted error. Perhaps the court said more than necessary but there is nothing to indicate an expression of opinion as to the weight of the evidence or any attempt to influence the jury. We therefore find defendants' issue without merit.

Defendants' final issue asks this Court to consider "[w]hether the cumulative effect of all the errors complained of in this appeal denied Defendants a fair trial by a fair and impartial jury." Although we have held that the trial court's error in granting Plaintiff eight peremptory challenges alone necessitates a remand for new trial, we note that the cumulative effect of this procedural error, along with the several errors already addressed, deprived defendants of a fair trial, thereby constituting harmful error sufficient to warrant a new trial.

In light of our holding remanding this case for new trial, we pretermit all other issues.

In conclusion, the trial court's judgment on the jury verdict is vacated and the case is remanded for a new trial. Costs of the appeal are assessed one-half to plaintiff, Sherry Hunter, Administratrix of the estate of Lawrence Hunter, deceased, and one-half to defendants, Jay Michael Ura, M.D. and Nashville Anesthesia Services, and their sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.